484 F.2d 1307
 Elizabeth HOLTZMAN, Individually and in her capacity as a
member of the United States House of
Representatives, et al., Plaintiffs-Appellees,
v.
James R. SCHLESINGER, Individually and as Secretary of
Defense, et al., Defendants-Appellants.
 No. 1132, Docket 73-2094.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 8, 1973.
Decided Aug. 8, 1973.
 
 Burt Neuborne, New York City (Leon Friedman, American Civil Liberties Union, New York City, Norman Siegel and Paul G. Chevigny, New York Civil Liberties Union, New York City, of counsel), for plaintiffs-appellees.
 James Dunlop Porter, Jr., Asst. U. S. Atty., Chief, Civil Div., Brooklyn, N. Y. (Robert A. Morse, U. S. Atty., E.D.N. Y.), for defendants-appellants.
 Eric M. Lieberman, New York City (Michael Krinsky, New York City, of counsel), for Parren J. Mitchell, and others, as amici curiae.
 Joseph F. McDonald, New York City, for The Lawyers Committee to End the War and Certain Individuals as amici curiae.
 Before MULLIGAN, OAKES and TIMBERS, Circuit Judges.
 MULLIGAN, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the United States District Court, Eastern District of New York, Hon. Orrin G. Judd, District Judge, dated July 25, 1973, 361 F.Supp. 553, granting plaintiffs' motion for summary judgment and providing both declaratory and injunctive relief. The judgment declared that "there is no existing Congressional authority to order military forces into combat in Cambodia or to release bombs over Cambodia, and that military activities in Cambodia by American armed forces are unauthorized and unlawful . . .." The order further enjoined and restrained the named defendants and their officers, agents, servants, employees and attorneys "from participating in any way in military activities in or over Cambodia or releasing any bombs which may fall in Cambodia." The effective date of the injunction was postponed until 4:00 o'clock on July 27, 1973 to provide the defendants with an opportunity to apply to this court for a stay pending appeal. A panel of this court heard oral argument on the stay on the morning of July 27, 1973 and unanimously granted defendants' motion for a stay, setting the time for argument of the appeal on August 13, 1973 which was the first day of sitting of the next panel of this court. The parties were given leave to move for further expedition of the appeal. Plaintiffs then made application to Mr. Justice Marshall of the Supreme Court, Circuit Justice for the Second Circuit, for a vacatur of the stay. Mr. Justice Marshall denied the application to vacate the stay on August 1, 1973 writing an opinion in which he noted that either side could further advance the date of the argument before this court, - U.S. -, 94 S.Ct. 1, 38 L.Ed.2d 18. On the motion of plaintiffs, not opposed by defendants, this court on August 1st further accelerated argument of the appeal to August 8, 1973. On August 2, 1973, plaintiffs made application to Mr. Justice Douglas to vacate the stay and on August 4, 1973 he issued an opinion and order vacating the stay entered by this court. - U.S. -, 94 S.Ct. 8, 38 L.Ed.2d 28. Later in the afternoon of August 4, 1973, Mr. Justice Marshall reinstated the stay announcing that he had polled the other members of the Supreme Court and that they were unanimous in overruling the order of Mr. Justice Douglas. - U.S. -, 94 S.Ct. 11, 38 L.Ed.2d 33. On August 3, 1973, after a hearing before Mr. Justice Douglas, plaintiffs petitioned this court for an en banc hearing of this appeal. By order dated August 6th this motion was denied by the unanimous vote of the five active judges of this court who could be readily contacted. In view of the admonition of Mr. Justice Marshall that it is in the public interest that the issues herein be resolved as expeditiously as possible, the convening of this court en banc could only have delayed a hearing on the merits.
 
 
 2
 The argument of this appeal was heard on August 8th and to further speed any further appellate review this court filed its judgment in the late afternoon of that day, reversing the judgment below and dismissing the complaint. Judge Oakes dissented. We announced that opinions would promptly follow so that if the Supreme Court did entertain an appeal it might have the benefit of the views of the panel. Even though the exigencies of time preclude the articulation of the majority view as elaborately or completely as might otherwise be appropriate in a case of this significance, it nonetheless represents our considered and deliberate opinion.
 
 
 3
 * At the outset, as the parties agreed below and on the argument on appeal, we should emphasize that we are not deciding the wisdom, the propriety or the morality of the war in Indo-China and particularly the on-going bombing in Cambodia. This is the responsibility of the Executive and the Legislative branches of the government. The role of the Judiciary is to determine the legality of the challenged action and the threshold question is whether under the "political question" doctrine we should decline even to do that. Ever since Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803) the federal courts have declined to judge some actions of the Executive and some interaction between the Executive and Legislative branches where it is deemed inappropriate that the judiciary intrude. It is not possible or even necessary to define the metes and bounds of that doctrine here. The most authoritative discussion of the subject is found in Mr. Justice Brennan's opinion in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962) which elaborated criteria that have since guided this court in determining whether a question involving the separation of powers is justiciable or is a political question beyond our purview. In Orlando v. Laird, 443 F.2d 1039 (2d Cir.), cert. denied, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971), this court held that the question of whether or not Congress was required to take some action to authorize the Indo-China war was justiciable under Baker v. Carr, supra, since there was present a judicially discoverable and manageable issue. See Coleman v. Miller, 307 U.S. 433, 454-455, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). On the basis of evidence produced at the hearings in the district court, this court found Congressional authorization in support of the military operations in Southeast Asia from the beginning, relying on the Tonkin Gulf Resolution of August 10, 1964, plus continuing appropriation bills providing billions of dollars in support of military operations as well as the extension of the Military Selective Service Act. We were careful to note:
 
 
 4
 Beyond determining that there has been some mutual participation between Congress and the President, which unquestionably exists here, with action by the Congress sufficient to authorize or ratify the military activity at issue, it is clear that the constitutional propriety of the means by which Congress has chosen to ratify and approve the protracted military operations in Southeast Asia is a political question. Id., 443 F.2d at 1043 (emphasis in original).
 
 
 5
 It is significant that the court noted that the Tonkin Gulf Resolution of August 10, 1964 had since been repealed on December 31, 1970.
 
 
 6
 In Da Costa v. Laird, 448 F.2d 1368 (2d Cir. 1971), cert. denied, 405 U.S. 979, 92 S.Ct. 1193, 31 L.Ed.2d 255 (1972), this court specifically rejected the contention that the repeal by Congress of the Tonkin Gulf Resolution removed the Congressional authorization previously found sufficient in Orlando. We noted:
 
 
 7
 As the constitutional propriety of the means by which the Executive and the Legislative branches engaged in mutual participation in prosecuting the military operations in Southeast Asia, is, as we held in Orlando, a political question, so the constitutional propriety of the method and means by which they mutually participate in winding down the conflict and in disengaging the nation from it, is also a political question and outside of the power and competency of the judiciary. Id. at 1370.
 
 
 8
 The most recent holding of this court now pertinent is Da Costa v. Laird, 471 F.2d 1146 (1973) where an inductee urged that the President's unilateral decision to mine the harbors of North Vietnam and to bomb targets in that country constituted an escalation of the war, which was illegal in the absence of additional Congressional authorization. Judge Kaufman found that this was a political question which was non-justiciable, recognizing that the court was incapable of assessing the facts. He stated in part:
 
 
 9
 Judges, deficient in military knowledge, lacking vital information upon which to assess the nature of battlefield decisions, and sitting thousands of miles from the field of action, cannot reasonably or appropriately determine whether a specific military operation constitutes an "escalation" of the war or is merely a new tactical approach within a continuing strategic plan. What if, for example, the war "de-escalates" so that it is waged as it was prior to the mining of North Vietnam's harbors, and then "escalates" again? Are the courts required to oversee the conduct of the war on a daily basis, away from the scene of action? In this instance, it was the President's view that the mining of North Vietnam's harbors was necessary to preserve the lives of American soliders (sic) in South Vietnam and to bring the war to a close. History will tell whether or not that assessment was correct, but without the benefit of such extended hindsight we are powerless to know.
 
 
 10
 We fail to see how the present challenge involving the bombing in Cambodia is in any significant manner distinguishable from the situation discussed by Judge Kaufman in Da Costa v. Laird. Judge Judd found that the continuing bombing of Cambodia, after the removal of American forces and prisoners of war from Vietnam, represents "a basic change in the situation: which must be considered in determining the duration of prior Congressional authorization." He further found such action a tactical decision not traditionally confided to the Commander-in-Chief. These are precisely the questions of fact involving military and diplomatic expertise not vested in the judiciary, which make the issue political and thus beyond the competence of that court or this court to determine. We are not privy to the information supplied to the Executive by his professional military and diplomatic advisers and even if we were, we are hardly competent to evaluate it. If we were incompetent to judge the significance of the mining and bombing of North Vietnam's harbors and territories, we fail to see our competence to determine that the bombing of Cambodia is a "basic change" in the situation and that it is not a "tactical decision" within the competence of the President. It is true that we have repatriated American troops and have returned American ground forces in Vietnam but we have also negotiated a cease fire and have entered into the Paris Accords which mandated a cease fire in Cambodia and Laos. The President has announced that the bombing of Cambodia will terminate on August 15, 1973 and Secretary of State Rogers has submitted an affidavit to this court[1] providing the justification for our military presence and action until that time. The situation fluctuates daily and we cannot ascertain at any fixed time either the military or diplomatic status. We are in no position to determine whether the Cambodian insurgents are patriots or whether in fact they are inspired and manned by North Vietnam Communists. While we as men may well agonize and bewail the horror of this or any war, the sharing of Presidential and Congressional responsibility particularly at this juncture is a bluntly political and not a judicial question.
 
 
 11
 We think the comments of Judge Wyzanski writing for a unanimous Court of Appeals panel in the District of Columbia are particularly apt here:
 
 
 12
 Whether President Nixon did so proceed [to end the war] is a question which at this stage in history a court is incompetent to answer. A court cannot procure the relevant evidence: some is in the hands of foreign governments, some is privileged. Even if the necessary facts were to be laid before it, a court would not substitute its judgment for that of the President, who has an unusually wide measure of discretion in this area, and who should not be judicially condemned except in a case of clear abuse amounting to bad faith. Otherwise a court would be ignoring the delicacies of diplomatic negotiation, the inevitable bargaining for the best solution of an international conflict, and the scope which in foreign affairs must be allowed to the President if this country is to play a responsible role in the council of the nations. Mitchell v. Laird, 476 F.2d 533, 538 (1973).
 
 
 13
 The court below and our dissenting Brother assume that since American ground forces and prisoners have been removed and accounted for, Congressional authorization has ceased as determined by virtue of the so-called Mansfield Amendment, P.L. 92-156, 85 Stat. 430, Sec. 601. The fallacy of this position is that we have no way of knowing whether the Cambodian bombing furthers or hinders the goals of the Mansfield Amendment. That is precisely the holding of Da Costa v. Laird, supra, 471 F.2d at 1157. Moreover, although Sec. 601(a)(1) of the Amendment urges the President to remove all military forces contingent upon release of American prisoners, it also in Sec. 601(a)(2) urges him to negotiate for an immediate cease fire by all parties in the hostilities in Indo-China. (Emphasis added). In our view, the return and repatriation of American troops only represents the beginning and not the end of the inquiry as to whether such a basic change has occurred that the Executive at this stage is suddenly bereft of power and authority. That inquiry involves diplomatic and military intelligence which is totally absent in the record before us, and its digestion in any event is beyond judicial management. The strictures of the political question doctrine cannot be avoided by resort to the law of agency as the court did below, finding the Congress the principal and the President an agent or servant.[2] Judicial ipse dixits cannot provide any proper basis particularly for the injunctive relief granted here which is unprecedented in American Jurisprudence.[3]II
 
 
 14
 Since the argument that continuing Congressional approval was necessary, was predicated upon a determination that the Cambodian bombing constituted a basic change in the war not within the tactical discretion of the President and since that is a determination we have found to be a political question, we have not found it necessary to dwell at length upon Congressional participation. We see no need to address ourselves to the Fulbright provisos discussed in Judge Oakes' opinion since they predate the Paris Accord which places the military stance in Cambodia in such focus that we cannot judge their present efficacy or applicability. In any event we agree with his conclusion that they do not affect American forces which is the issue here. We cannot resist however commenting that the most recent expression of Congressional approval by appropriation, the Joint Resolution Continuing Appropriations for Fiscal 1974 (P.L. 93-52), enacted into law July 1, 1973, contains the following provision:
 
 
 15
 Sec. 108. Notwithstanding any other provision of law, on or after August 15, 1973, no funds herein or heretofore appropriated may be obligated or expended to finance directly or indirectly combat activities by United States military forces in or over or from off the shores of North Vietnam, South Vietnam, Laos or Cambodia.
 
 
 16
 Assuming arguendo that the military and diplomatic issues were manageable and that we were obliged to find some participation by Congress, we cannot see how this provision does not support the proposition that the Congress has approved the Cambodian bombing. The statute is facially clear but its applicability is contested by plaintiffs on several grounds which were essentially adopted by the court below. The argu ment is made that the Congress didn't really mean what it said because it was coerced by the President who had vetoed Congressional Bills which would have immediately cut off Cambodian funds. Not being able to muster sufficient strength to overcome the veto, the argument runs, the Congress was forced willy nilly to enact the appropriation legislation. Resort is made to the floor debate which it is argued bolsters the view that individual legislators expressed personal disapproval of the bombing and did not interpret the appropriation as an approval to bomb but simply a recognition that it gave the President the power to bomb. It is further urged that since the Constitution entrusts the power to declare war to a majority of the Congress, the veto exercised makes it possible for the President to thwart the will of Congress by holding one-third plus one of the members of either House. We find none of these arguments persuasive.
 
 
 17
 1) Since the statute is not ambiguous, resort to legislative history is unjustified. See Mr. Justice Jackson's opinion in Schwegmann v. Calvert Distillers Corp., 341 U.S. 384, 395-396, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).
 
 
 18
 2) Resort to legislative materials is not permissible where they are contradictory or ambiguous. NLRB v. Plasterers' Local, etc., 79, 404 U.S. 116, 129 n. 24, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971). A fair reading of the Congressional Record for June 29, 1973 establishes this proposition. Members of Congress Drinan and the plaintiff Holtzman here for example both voted against the measure because it would authorize the bombing until August 15, 1973.
 
 
 19
 While the court below relied on the colloquy between Senators Eagleton and Fulbright, it inadvertently omitted the following:
 
 
 20
 Mr. Eagleton. In the light of the legislative history, meaning the statement of former Secretary of Defense Richardson that we will continue the bombing unless the funds are cut off, will we with the adoption of this resolution permit the bombing of Cambodia for the next 45 days? This is the question I pose to the Senator from Arkansas.
 
 
 21
 Mr. Fulbright. Until August 15.
 
 
 22
 Mr. Eagleton. Would it permit the bombing of Laos?
 
 
 23
 Mr. Fulbright. It would not prevent it.
 
 
 24
 119 Cong.Rec. S 12562 (daily ed. June 29, 1973) [Emphasis added].
 
 
 25
 In sum, even if the legislative history were considered it is at best ambiguous and does not clearly support the theory that the Congress did not mean what it said.
 
 
 26
 3) We cannot agree that the Congress was "coerced" by the President's veto. There was unquestionably a Congressional impasse resulting from the desire of a majority of Congress to stop bombing immediately and the desire of the President that his discretion be unfettered by an arbitrarily selected date. Instead of an acute constitutional confrontation, as Senator Javits noted an "agreement" was reached. (119 Cong. Rec. S 12561 (daily ed. June 29, 1973)). This version of the situation is also the conclusion of Judge Tauro in his opinion of August 8, 1973 (Drinan v. Nixon, 364 F.Supp. 854 (D.Mass.)) which exhaustively studies the record.
 
 
 27
 4) While the Constitution vests the war declaring authority in the Congress, the Founding Fathers also conferred the veto power upon the President. (Art. I, Sec. 7, cl. 2). The suggestion that the veto power is impotent with respect to an authority vested solely in Congress by the Constitution is unsupported by any citation of authority and is hardly persuasive. It of course assumes here that the Cambodian bombing constitutes a new war requiring a new declaration and that it is not part of the extrication of a long suffering nation from an Indo-China war lasting for several years. This again in our view is the nucleus of the issue and we have no way of resolving that question particularly here on a motion for summary judgment.[4]III
 
 
 28
 We finally note, although again not necessary in view of our holding in Part I, our disagreement with our colleague Judge Oakes that any of the parties plaintiff have standing. We have held that mere taxpayer status does not confer standing to litigate the constitutionality of the Indo-China war. Pietsch v. President of the United States, 434 F.2d 861 (2d Cir. 1970), cert. denied, 403 U.S. 920, 91 S.Ct. 2236, 29 L.Ed.2d 698 (1971); see Velvel v. Nixon, 415 F.2d 236 (10th Cir. 1969), cert. denied, 396 U.S. 1042, 90 S.Ct. 684, 24 L.Ed.2d 686 (1970). See also Mottola v. Nixon, 464 F.2d 178 (9th Cir. 1972). In Berk v. Laird, 429 F.2d 302, 306 (2d Cir. 1970), we held that a serviceman does have standing if he is under orders to fight in the combat to which he objects. Here none of the servicemen plaintiffs are presently under orders to fight in Cambodia. They have been relieved of any such military obligation and indeed one has been separated from the service. Their present status in our view moots the appeal as to them and we cannot agree that their status is preserved because of the "cognizable danger of recurrent violation" doctrine of United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In view of the termination of the air strikes on August 15, 1973 and their present status, we can perceive of nothing more than the merest possibility that such eventuality will occur. United States v. W. T. Grant Co., supra, requires more than this. See Atherton Mills v. Johnston, 259 U.S. 13, 42 S.Ct. 422, 66 L.Ed. 814 (1922). Neither do we see any adequate support for the standing of Representative Holtzman. She has not been denied any right to vote on Cambodia by any action of the defendants. She has fully participated in the Congressional debates which have transpired since her election to the Congress. The fact that her vote was ineffective was due to the contrary votes of her colleagues and not the defendants herein. The claim that the establishment of illegality here would be relevant in possible impeachment proceedings against the President would in effect be asking the judiciary for an advisory opinion which is precisely and historically what the "case and controversy" conditions set forth in Article III, Section 2 of the Constitution forbid. See Correspondence of the Justices (1793), reprinted in part in H. Hart & H. Wechsler, The Federal Courts and the Federal System 64-66 (2d ed. P. Bator et al. 1973). The judgment sought could hardly have any subsequent binding effect on those who have the responsibility for such a measure. Its effect on the named defendants would be clearly academic and moot since they have no interest in controverting it.
 
 
 29
 The judgment is reversed and the case is remanded with instructions to dismiss the complaint. The mandate shall issue forthwith.
 
 OAKES, Circuit Judge (dissenting):
 
 30
 I believe there is standing for Congresswoman Holtzman under Baker v. Carr, 369 U.S. 186, 207-208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and Coleman v. Miller, 307 U.S. 433, 437-446, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). I believe there is standing for the airmen-appellees under Berk v. Laird, 429 F.2d 302 (2d Cir. 1970) and Massachusetts v. Laird, 451 F.2d 26, 29 (1st Cir. 1971) which has not been mooted by their return to the United States. United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).
 
 
 31
 I believe there is justiciability under Da Costa v. Laird, 471 F.2d 1146, 1156 (2d Cir. 1973), (Da Costa III) where the question "whether a radical change in the character of war operations . . . might be sufficiently measurable judicially to warrant a court's consideration . . . ." was expressly reserved. There is here "a manageable standard" under Da Costa III and Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), since there has been such a "radical change in the character of war operations." The Defense Department is continuing to bomb in Cambodia despite the cease-fire in Vietnam and despite the return of our prisoners of war from North Vietnam. The justiciable question then is whether there is any Constitutional authorization for the employment of United States armed forces over Cambodia, now that the war in Vietnam has come to an end. There is no question under the law of this Circuit, Orlando v. Laird, 443 F.2d 1039, 1042 (2d Cir.) cert. denied, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971), that the Executive lacks unilateral power to commit American forces to combat absent a "belligerent attack" or "a grave emergency." See Mitchell v. Laird, 476 F.2d 533 (D.C.Cir. 1973).
 
 
 32
 Has Congress ratified or authorized the bombing in Cambodia by appropriations acts or otherwise? Congress can confer power on the Executive by way of an appropriations act. Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 116, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947) (creation of new agency by Executive Order ratified by appropriation). And this Circuit has expressly held that congressional authorization for the war in Vietnam may be found in appropriations acts. Da Costa v. Laird, 448 F.2d 1368, 1370 (2d Cir. 1971), cert. denied, 405 U.S. 979, 92 S.Ct. 1193, 31 L.Ed.2d 255 (1972) (Da Costa II). Orlando v. Laird, supra, 443 F.2d at 1042.
 
 
 33
 I do not, moreover, agree with appellees' argument that the Fulbright "proviso" adopted in all of the recent appropriations bills and limiting the use of Defense Department funds to support "Vietnamese or other free world forces in actions designed to provide military support and assistance to the government of Cambodia or Laos," limited all prior authorizations to expenditures for United States forces in Cambodia only in aid in the release of Americans held as prisoners of war. E. g., Armed Forces Military Procurement Act of 1971, Pub.L.No.91-441, Sec. 502(a)(1), 84 Stat. 905 (1970). The language of the appropriations acts seems to me to differentiate between "other free world forces" and "Armed Forces of the United States," e. g., id. Sec. 502(a)(2). The legislative history indicates also that there is a difference between "other free world forces" and "United States armed forces." Even though the Fulbright proviso did not provide any affirmative grant of authority to the President to use "Armed Forces of the United States" in Cambodia, 119 Cong.Rec. S 7385-87 (daily ed. Apr. 13, 1973), Senator Fulbright himself considered the proviso operative only in respect to "South Vietnamese or other foreign military operations in support of the Cambodian or Laotian Governments." Id. at S. 7385 (emphasis supplied).
 
 
 34
 Thus an argument could be made that congressional authorization of appropriations with knowledge of our "presence" in Cambodia was ratification. But for authorization on the part of Congress by way of an appropriation to be effective, the congressional action must be based on a knowledge of the facts. Greene v. McElroy, 360 U.S. 474, 506-507, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (appropriation to Defense Department for security program did not ratify procedure denying right of an individual to confront witnesses). I am aware of only one instance in which it has previously been argued that a war was illegal as a result of Congress being misinformed as to the underlying facts surrounding American participation in that war. While the argument was unique and unsuccessful to boot, however, time has vindicated it, I believe. Furthermore, it was advanced by one whose views are worth consideration, even if they were expressed in "dissent," so to speak. I refer of course to Abraham Lincoln and his argument as a lone Congressman on January 12, 1848, in opposition to our "incursion" into Mexico and what later was called the Mexican War. See Cong. Globe, 30th Cong. 1st Sess. 93 et seq. (Appendix 1848).
 
 
 35
 And here, incredibly enough, it appears that neither the American people nor the Congress, at the time it was voting appropriations in aid of the war in Vietnam, were given the facts pertaining to our bombing in Cambodia. Recent disclosures have indicated that Air Force B-52 bombers were secretly attacking Cambodia in 1969, 1970 and even later while the United States was publicly proclaiming respect for Cambodian neutrality. See N.Y.Times July 17, 1973, at 1; July 18, 1973, at 1, July 22, 1973, Sec. E, at 3; July 24, 1973, at 1; July 25, 1973, at 1; July 29, 1973, at 1; Aug. 8, 1973, at 6; Aug. 9, 1973, at 7.
 
 
 36
 The government argues that these secret bombings occurred in 1969 and 1970, and ended when our activities in Cambodia became open subsequently. But the Congress whose ratification by way of appropriations acts is contended for here did not become aware of these covert bombings until July of 1973. And meanwhile the Congress had declared in the so-called Mansfield Amendment that it was "the policy of the United States to terminate at the earliest practicable date all military operations of the United States in Indochina . . . ." Appropriations Authorization-Miltary Procurement Act of 1972, Pub.L.No.92-156, Sec. 601, 85 Stat. 423 (92nd Cong., 1st Sess. 1971).
 
 
 37
 The combination of concealment of the facts from Congress together with the enactment of a policy of "earliest practicable" withdrawal do not amount in my mind to an appropriations carte blanche to the military to carry on bombing in Cambodia after the cease-fire, withdrawal of our troops from Vietnam, and return of our prisoners of war from North Vietnam.
 
 
 38
 We come then to the effect of the legislation, following upon a presidential veto of an immediate prohibition against the use of funds to bomb in Cambodia, adopted as a compromise this July 1st: the Continuing Appropriations Act for Fiscal Year 1974, Pub.L.No.93-52, 93rd Cong. 2nd Sess. (July 1, 1973) which expressly provided that ". . . on or after August 15, 1973, no funds herein or heretofore appropriated may be obligated or expended to finance directly or indirectly combat activities by United States military forces in or over or from off the shores of North Vietnam, South Vietnam, Laos or Cambodia." Sec. 108. In colloquy between Senators Eagleton and Fulbright, inadvertently omitted in the briefs of appellees and the opinion of the lower court, the former inquired whether "the adoption of this resolution [would] permit the bombing of Cambodia" and Senator Fulbright replied, "Until August 15". 119 Cong.Rec. S 12562 (daily ed. June 29, 1973). Again, in the same colloquy Senator Fulbright, conceding "Presidential power", said that "The President has the power to do a lot of things of which I do not approve," after being asked by Senator Eagleton whether under the resolution the President's "power to bomb in Indochina . . . will now be sanctioned by our action." Id. In neither case, however, is there recognition of legality or past authorization. Senator Fulbright had previously stated, as Judge Judd recognized, that "The acceptance of an August 15 cut off date should in no way be interpreted as recognition by the committee of the President's authority to engage U.S. forces in hostilities until that date. The view of most members of the committee has been and continues to be that the President does not have such authority in the absence of specific congressional approval." 119 Cong.Rec. S 12560 (daily ed. June 29, 1973).
 
 
 39
 It can be argued that Congress could, if it had so desired, cut off the funds for bombing Cambodia immediately by overriding the Presidential veto. This was indeed championed by those voting against the ultimate compromise Resolution. But it does not follow that those who voted in favor of the Resolution were thereby putting the Congressional stamp of approval on the bombing continuation. While the Resolution constituted a recognition that Executive power was being exercised, it did not constitute a concession that such exercise was rightful, lawful or constitutional.
 
 
 40
 It may be that those voting for the Resolution thought that in some way previous appropriations acts or the omission expressly to prohibit a continuation of bombing after the cease-fire and return of our prisoners of war amounted to an authorization, which could only be limited by affirmative congressional action. But as I have previously suggested I cannot find any express congressional authorization for such a continuation of the Cambodian bombing, nor do I think that authorization can be implied from prior appropriations acts. This being true, affirmative action on the part of Congress was not necessary as a matter of constitutional law. An agreement by the Executive to some cut off date was essential, however, because the legality of bombing continuation might not be tested or testable for months to come, by the very nature of the judicial process. Therefore, Congress as I see it, took the only practical way out. It acknowledged the reality of the Executive's exercise of power even while it disputed the Executive's authority for that exercise. It agreed to a final cut-off date as the best practical result but never conceded the legality or constitutionality of interim exercise.
 
 
 41
 Thus the Resolution of July 1, 1973 cannot be the basis for legalization of otherwise unlawful Executive action. We are talking here about the separate branches of government, and in doing so we must distinguish between the exercise of power on the one hand and authorization for such exercise on the other. That the Executive Branch had the power to bomb in Cambodia, there can be no doubt; it did so, and indeed is continuing to do so. Whether it had the constitutional authority for its action is another question.
 
 
 42
 If we return to fundamentals, as I think we must in the case of any conflict of view between the other two Branches of Government, it will be recalled that the Founding Fathers deliberately eschewed the example of the British Monarchy in which was lodged the authority to declare war and to raise and regulate fleets and armies. See The Federalist No. 69 (A. Hamilton). Rather, these powers were deliberately given to the Legislative Branch of the new American Republic in Article I, section 8 of the Constitution. See 7 Works of Alexander Hamilton 81 (J. Hamilton ed. 1851), cited in Note, Congress, The President, and The Power to Commit Forces to Combat, 81 Harv.L.Rev. 1771, 1773, n. 14 (1968). I fail to see, and the Government in its able presentation has failed to point out, where the Congress ever authorized the continuation of bombing in Cambodia after the cease-fire in Vietnam, the withdrawal of our forces there, and the return of our prisoners of war to our shores. Accordingly, I must dissent, and although on a somewhat different analysis would affirm the judgment below.
 
 
 
 [1]
 Affidavit of William P. Rogers
 Washington,
 District of Columbia, ss.
 William P. Rogers, being duly sworn, deposes and says as follows:
 
 
 [1]
 In my capacity as Secretary of State of the United States of America, I have knowledge of and responsibility for the conduct of the foreign relations of the United States, including relations with the Government of Cambodia
 
 
 [2]
 It is my understanding that on July 25, 1973, the United States District Court for the Eastern District of New York in the case of Holtzman et al v. Schlesinger et al, ordered the cessation of further military activities by United States armed forces in Cambodia and that this order was stayed by the United States Court of Appeals for the Second Circuit. It is my judgment, that if that stay were not continued, the District Court's order would cause irreparable harm to the United States, to the conduct of our foreign relations, and to the protection of United States nationals in Cambodia
 
 
 [3]
 In the conduct of United States relations with Cambodia, the American Ambassador in Phnom Penh has communicated to the Cambodian Government the fact of the enactment on July 1, 1973 of Public Law 93-50 (87 Stat. 99) and Public Law 93-52 (87 Stat. 130). Our Ambassador has further informed the Cambodian Government that the United States Government interprets the aforesaid public laws as requiring a cessation of all combat activities in Cambodia by the armed forces of the United States on and after August 15, 1973
 
 
 [4]
 In consequence of the enactment of the aforesaid public laws, intensive planning has been undertaken within the United States Government and between representatives of the American and Cambodian Governments. As a result, plans have been developed which include:
 (i) emergency increases in the levels of the Cambodian armed forces;
 (ii) accelerated deliveries and distribution during the first two weeks in August of military equipment, especially aircraft and related spare parts, pursuant to the United States Military Assistance Program;
 (iii) accelerated deliveries and distribution during this same period of food stuffs, medical supplies and other items for humanitarian relief of the Cambodian population.
 (iv) redeployment of Cambodian armed forces, and in some cases civilians whom those forces are protecting, from exposed positions to positions where they can defend themselves and be resupplied in the absence of United States combat air support on and after August 15, 1973.
 
 
 [5]
 All of the above-described plans are for the purpose of improving the Government of Cambodia's self-defense capability through assistance programs approved by the Congress and the President. All of these plans have been premised upon an assumption of continued United States combat air support for the Cambodian armed forces through August 14, 1973. On the basis of the information available to me, it is my judgment that the absence of such air support prior to that date would permit hostile military forces to disrupt those plans and would expose United States military and civilian personnel who are responsible for their implementation, to grave risk of personal injury or death
 
 
 [6]
 Moreover, in view of this close cooperation and planning between the United States and the Cambodian Government, and considerable reliance placed by the Cambodian Government on this agreed timing, any premature and unilateral cessation of needed air support by the United States would be seen by the Government of Cambodia and by many other governments as a breach of faith by the United States and would seriously undermine the credibility of the United States and impair the conduct of our foreign relations
 
 
 [7]
 Quite apart from the question of timing, the order of the District Court, in enjoining "military activities" might well be construed more broadly than the prohibitions against "combat activities" contained in the above-mentioned public laws and thereby could be deemed to preclude such activities as the use of United States armed forces to evacuate United States diplomatic personnel and other United States nationals from Cambodia should this be required at any future time, even after United States combat activities in Cambodia have ceased
 
 
 [8]
 The specific consequences as described herein of a failure to stay the District Court's order would constitute irreparable harm to the conduct of the foreign relations of the United States by imperiling the ability of the Government of Cambodia to prepare for assuming full responsibility for its defense, by imperiling the safety of United States nationals in Cambodia, and by undermining the credibility of the United States. In a broader sense, the efforts of the United States to achieve a stable peace in Indochina would be undermined and the ceasefire agreements presently in effect in Viet-Nam and Laos would be gravely jeopardized
 /s/ William P. Rogers
 
 
 [2]
 The resort of the court below to the Second Restatement of Agency Sec. 38, promulgated by the American Law Institute, is indeed inapposite. Aside from its introductory Scope Note (p. 2) which disclaims the Restatement's applicability to public officers, the denomination of the Congress as the Principal and the President as the Agent in the conduct of hostilities is overly simplistic. It ignores the President's role as Commander-in-Chief, and his primacy in foreign relations, particularly in achieving the peace. See Wallace, The War Making Powers: A Constitutional Flaw? 57 Cornell L.Rev. 719, 744 (1972). It is perhaps significant that the Constitutional Convention explicitly rejected a proposal that the Constitution provide the Congress with the power to declare peace as well as war, and carefully noted that the conduct of war "was an Executive function." 2 M. Farrand, Records of the Federal Convention of 1787, at 313, 319 & n* (rev. ed. 1937).
 
 
 [3]
 To date no other federal court has attempted to halt American involvement in hostilities in Southeast Asia. Our own court as well as the First Circuit has concluded that the war-implementing legislation passed by Congress was sufficient authorization. Da Costa v. Laird, 448 F.2d 1368 (2d Cir. 1971), cert. denied, 405 U.S. 979, 92 S.Ct. 1193, 31 L.Ed.2d 255 (1972); Orlando v. Laird, 443 F.2d 1039 (2d Cir.), cert. denied, 404 U.S. 869, 92 S.Ct. 94, 30 L.Ed.2d 113 (1971), aff'g 317 F.Supp. 1013 (E.D.N.Y.1970) and Berk v. Laird, 317 F. Supp. 715 (E.D.N.Y.1970) (Judd, J.); Massachusetts v. Laird, 451 F.2d 26 (1st Cir.), aff'g 327 F.Supp. 378 (D.Mass.1971). Numerous courts have dismissed suits challenging American involvement on the ground that a "political question" was involved. Mitchell v. Laird, 476 F.2d 533 (D.C.Cir. 1973); Da Costa v. Laird, 471 F.2d 1146 (2d Cir. 1973); Mora v. McNamara, 128 U.S.App.D.C. 297, 387 F.2d 862, cert. denied, 389 U.S. 934, 88 S.Ct. 282, 19 L.Ed.2d 287 (1967); Luftig v. McNamara, 126 U.S. App.D.C. 4, 373 F.2d 664, cert. denied, 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332 (1967) (cf. Mitchell v. Laird, supra); Drinan v. Nixon, 364 F.Supp. 854 (D.Mass., 1973); Mitchell v. Richardson, Civ.No. 939-73 (D.D.C., July 23, 1973), notice of appeal filed, Aug. 1, 1973; Gravel v. Laird, 347 F.Supp. 7 (D.D.C.1972); Atlee v. Laird, 347 F.Supp. 689 (E.D.Pa.1972), aff'd without opinion, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973); Massachusetts v. Laird, 327 F.Supp. 378 (D.Mass.), aff'd on other grounds, 451 F.2d 26 (1st Cir. 1971) (but cf. Mitchell v. Laird, supra); Davi v. Laird, 318 F.Supp. 478 (W. D.Va.1970). One might also include cases such as Sarnoff v. Connally, 457 F.2d 809 (9th Cir.), cert. denied, 409 U.S. 929, 93 S. Ct. 227, 34 L.Ed.2d 186 (1972), and Head v. Nixon, 342 F.Supp. 521 (E.D.La.), aff'd, 468 F.2d 951 (5th Cir. 1972), where the courts dismissed claims that Congressional appropriations were an unconstitutional delegation of the war-making powers, as involving political questions. See also Atlee v. Laird, supra. Other suits challenging the legality of the war have been dismissed on other grounds. Mottola v. Nixon, 464 F.2d 178 (9th Cir. 1972), rev'g 318 F.Supp. 538 (N.D.Cal.1970) (standing); Pietsch v. President of the United States, 434 F.2d 861 (2d Cir. 1970), cert. denied, 403 U.S. 920, 91 S.Ct. 2236, 29 L.Ed.2d 698 (1971) (standing); Velvel v. Nixon, 415 F.2d 236 (10th Cir. 1969), cert. denied, 396 U.S. 1042, 90 S.Ct. 684, 24 L.Ed.2d 686 (1970), aff'g 287 F.Supp. 846 (D.Kan.1968) (standing); Campen v. Nixon, 56 F.R.D. 404 (N. D.Cal.1972) (standing); Gravel v. Laird, supra (political question, standing and sovereign immunity); Da Costa v. Nixon, 55 F.R.D. 145 (E.D.N.Y.), aff'd without opinion, 456 F.2d 1335 (2 Cir. 1972)
 We find particularly persuasive the scholarly opinion of Judge Adams of the Third Circuit in Atlee v. Laird, supra, the only case involving the Southeast Asia conflict which the Supreme Court has affirmed. In all other cases where review was sought, certiorari has been denied as this note documents. In Massachusetts v. Laird, 400 U.S. 886, 91 S.Ct. 128, 27 L.Ed.2d 130 (1970), the Supreme Court denied the Commonwealth of Massachusetts leave to file an original bill of complaint seeking an adjudication of the constitutionality of the United States role in the Indo-China war.
 
 
 [4]
 The dissenting opinion of Judge Oakes, finding no Congressional authorization by appropriation by reason of the secret bombings of Cambodia in 1969 and 1970 as reported in the New York Times (which is not in the Record before us any more than the Pentagon Papers were before this court in Da Costa v. Laird, supra, 448 F.2d at 1370) if anything emphasizes the inability of the judiciary to make reasoned judgments with manageable or discoverable information in foreign relations particularly in time of war. Secrecy in diplomacy and in military strategy during hostilities has been customary since at least the time of the Trojan War. The relationship of the alleged misfeasance here committed and the action of Congress is again a political question. Its propriety in any event is beyond the scope of appropriate judicial scrutiny. See Proverbs 20, v. 18 "Designs are strengthened by counsels: and wars are to be managed by governments."