JOHN DAVID EGNAL, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CLAUDIA ANN ELFERDINK AND JOHN DAVID EGNAL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5760-73, 3690-75.    Filed November 4, 1975.

*John David Egnal* and Claudia Ann Elferdink, pro se.
*Lowell F. Raeder,* for the respondent.

OPINION

TANNENWALD, *Judge:* These cases come before us on respondent's motion for judgment on the pleadings in docket No. 5760-73 and on his motion to dismiss for failure to state a claim in docket No. 3690-75. Respondent determined the following deficiencies in income tax[1] against petitioners (who were residents of Philadelphia, Pa., at the time of the filing of the petitions herein):

| Docket No. | Year | Deficiency |
|---|---|---|
| 5760-73 _____ | 1970 | $274.62 |
| 3690-75 _____ | 1973 | 6,289.30 |

---

[1] For the taxable year 1970, respondent, by amended answer, seeks an increased deficiency of $5,406.23. Because of our disposition of these cases in these proceedings, it is unnecessary for us to delineate the procedural "muddle" which caused respondent to claim such increased deficiency or the burden of proof issues which may be involved.

The gravamen of the petitions is that petitioners should not be called upon to pay any deficiency in tax because, during the taxable years at issue, the United States, by engaging in the Vietnam war, acted criminally in violation of its treaty obligations and the United States Constitution and petitioners' payment of taxes would cause them to be guilty of complicity in war crimes. Recognizing that this Court has previously refused to sustain taxpayers who asserted comparable positions (see *Susan Jo Russell,* 60 T.C. 942 (1973), *Abraham J. Muste,* 35 T.C. 913 (1961), and Memorandum Opinions too numerous to cite), petitioners argue that we should reexamine our prior decisions on the ground that they rest upon authorities which are distinguishable or are now of doubtful validity. On the basis of prior decisions, we would be inclined summarily to sustain respondent's motions. However, the careful and detailed manner in which petitioners have presented their case has influenced us to elaborate our views on the issues involved herein to a greater degree than we have in the past.

In their petitions, petitioners claim that, by prosecuting the war in Indochina, the United States violated "recognized statutes of domestic and international law, including the Constitution of the United States, the United Nations Charter, the Hague Convention of 1907, the Geneva Convention of 1949, the Nuremberg Principles, and the Geneva Accords of 1954, among others." However, although our reasoning herein is equally applicable to all of the foregoing, we have concentrated on the Nuremberg Principles because, in their memorandum offered in opposition to respondent's motions, petitioners focus on these principles and state their argument syllogistically, as follows:

Major premise: The Nuremberg Principles, particularly #7, prohibit complicity in the commission of crimes against peace (planning and waging of aggressive war) and war crimes.

Minor premise: The United States government * * * used substantial portions of its tax revenues to commit crimes against peace and war crimes.

1st Conclusion: The payment of taxes * * * by a United States citizen is "complicity" within the meaning of Nuremberg Principle No. 7;

2nd Conclusion: A United States citizen has the legal right to refuse payment of taxes * * * and United States courts have a duty to enforce that right.

The threshold question in a case such as this is whether the taxpayer has "standing." Here, there is a demand being made directly upon the petitioners, in the form of a claim for taxes, and

we think it clear that they have "standing" in the narrow frame of reference accorded to that term. *Autenrieth v. Cullen,* 418 F.2d 586 (9th Cir. 1969), cert. denied 397 U.S. 1036 (1970). Cf. *Pietsch v. President,* 434 F.2d 861 (2d Cir. 1970), cert. denied 403 U.S. 920 (1971); *Kalish v. United States,* 411 F.2d 606 (9th Cir. 1969) (per curiam), cert. denied 396 U.S. 835 (1969); *Susan Jo Russell, supra; Abraham J. Muste, supra.* See also *Flast v. Cohen,* 392 U.S. 83 (1968) ("first nexus" requirement).

A serious question exists, however, as to whether petitioners have standing in the broader sense of that term, i.e., whether petitioners have satisfied the "second nexus" requirement of *Flast v. Cohen, supra.*[2] See *Holtzman v. Schlesinger,* 484 F.2d 1307 (2d Cir. 1973), and cases cited, 484 F.2d at 1315. It is abundantly clear that the improper, illegal, or even unconstitutional behavior of the United States in the conduct of a war does not so permeate the system of government as to deprive it of its other sovereign prerogatives, including the power to tax. *Pietsch v. President, supra; Kalish v. United States, supra; Farmer v. Rountree,* 149 F. Supp. 327 (M.D. Tenn. 1956), affd. per curiam 252 F.2d 490 (6th Cir. 1958), cert. denied 357 U.S. 906 (1958); *Susan Jo Russell, supra; Abraham J. Muste, supra.* As to taxation, this principle follows a fortiori from cases holding that the power to raise armies by conscription is constitutionally distinct and legitimate without regard to the legality of the concurrent exercise of the war power. *United States v. Jacques,* 463 F.2d 653 (1st Cir. 1972); *United States v. Garrity,* 433 F.2d 649 (8th Cir. 1970); *United States v. Gillette,* 420 F.2d 298 (2d Cir. 1970), affd. 401 U.S. 437 (1971); *United States v. Owens,* 415 F.2d 1308 (6th Cir. 1969), cert. denied 397 U.S. 997 (1970); *Simmons v. United States,* 406 F.2d 456 (5th Cir. 1969), cert. denied 395 U.S. 982 (1969); cf. *United States v. Sisson,* 294 F. Supp. 511 (D. Mass. 1968), subsequent opinions at 294 F. Supp. 515 and 297 F. Supp. 902 (1969), appeal on other grounds dismissed 399 U.S. 267 (1970). On the basis of the foregoing authorities, we seriously question whether petitioners herein

---

[2] The "first nexus" requirement is the establishment of a "logical link" between the claimant's status as a taxpayer and the type of governmental action attacked. See 392 U.S. at 102. The "second nexus" requirement is between that status and the nature of the constitutional infringement alleged, i.e., that the challenged action "exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. 1, § 8." See 392 U.S. at 102-103.

satisfy the "second nexus" requirement.[3]

Beyond the question of "standing" in either its narrow or broad sense is the further question of "justiciability," a question to which petitioners devote a sizable portion of their legal argument. There is no doubt that the doctrine of justiciability has been substantially extended by *Baker v. Carr,* 369 U.S. 186 (1962), and its progeny. See also *United States v. Nixon,* 418 U.S. 683 (1974). But, whatever the scope of the standards enunciated in *Baker v. Carr* (see Mr. Justice Marshall's opinion in chambers in *Holtzman v. Schlesinger,* 414 U.S. 1304, 1311 (1973)), the courts have sought to draw a distinction between justiciability as to a case involving the respective roles of the three branches of our Federal Government, where an issue of internal domestic affairs is involved, and a case, such as this, where the issue involves foreign affairs (including the conduct of a foreign war) and have refused to find justiciability in the latter situation, at least where both the executive and the legislature have acted in the premises. *Luftig v. McNamara,* 373 F.2d 664 (D.C. Cir. 1967) (per curiam), cert. denied 387 U.S. 945 (1967); *Drinan v. Nixon,* 364 F. Supp. 854 (D. Mass. 1973); *United States v. Sisson, supra; Atlee v. Laird,* 347 F. Supp. 689 (E.D. Pa. 1972), affd. without opinion 411 U.S. 911 (1973), in which Adams, *J.,* speaking for a three-judge court, ably and exhaustively analyzes the "justiciability" cases in the context of the power to expend appropriated funds, emphasizes the foregoing distinction, and devotes considerable attention to the seemingly contrary thrust of *Orlando v. Laird,* 443 F.2d 1039 (2d Cir. 1971), and *Massachusetts v. Laird,* 451 F. 2d 26 (1st Cir. 1971).[4] On the

---

[3] We do not think this requirement would be met by the application of an apportionment formula to petitioners' income tax based upon the percentage of Federal expenditures allocable to the Vietnam war. Cf. *Autenrieth v. Cullen,* 418 F.2d 586 (9th Cir. 1969), cert. denied 397 U.S. 1036 (1970); *Farmer v. Rountree,* 149 F.Supp. 327 (M.D. Tenn. 1956), affd. per curiam 252 F.2d 490 (6th Cir. 1958), cert. denied 357 U.S. 906 (1958). Whether the necessary "second nexus" might be present where the taxing statute itself earmarked the revenues to be raised for a specific unconstitutional purpose is a question we need not now decide. Compare *United States v. Butler,* 297 U.S. 1 (1936), with *United States v. Kahriger,* 345 U.S. 22 (1953). See *Flast v. Cohen,* 392 U.S. 83 (1968), which indicates that the nexus must be related to a specific constitutional limitation, i.e., a negation of a legislative power. See 392 U.S. at 102-103. But see Mr. Justice Douglas dissenting from the denial of certiorari in *Sarnoff v. Shultz,* 409 U.S. 929 (1972), and from a denial of a motion to file a complaint in *Massachusetts v. Laird,* 400 U.S. 886 (1970).

[4] Since *Atlee v. Laird,* 347 F. Supp. 689 (E.D. Pa. 1972), affd. without opinion 411 U.S. 911 (1973), the Second Circuit Court of Appeals has in form maintained its benevolent attitude toward justiciability, but has taken a restrictive approach on the substantive issues. See *Holtzman v. Schlesinger,* 484 F.2d 1307 (2d Cir. 1973). See also *Mitchell v.*

basis of these authorities, we think it highly doubtful that the legality or constitutionality of the Vietnam war is within the scope of judicial competence.[5] The facts that the Vietnam war is over and that therefore the "political" character of the issues raised herein may not have the exacerbating effect that seemed to exist while the war continued (cf. *Poe v. Ullman,* 367 U.S. 497, 508-509 (1961), cited in *Flast v. Cohen,* 392 U.S. at 95) do not justify a different point of view.

We recognize that, if the doubts which we have indicated above were confirmed, the result might be that petitioners would be without a judicial forum in which to raise several of the issues they seek to have decided. But this is a consequence which cannot be avoided; petitioners must seek resolution of those issues in the political arena. See *Atlee v. Laird,* 347 F. Supp. at 708.[6] In any event, it is unnecessary for us to resolve those doubts because of our views on the "complicity" issue.

It seems clear that the Nuremberg Principles petitioners cite [7]

---

*Laird,* 488 F.2d 611 (D.C. Cir. 1973). Compare also Mr. Justice Douglas dissenting in *Massachusetts v. Laird,* n. 3 *supra.*

[5] In so indicating, we note that we do not necessarily accept petitioners' minor premise. See p. 256 *supra.* That premise assumes a legal conclusion and is therefore not deemed admitted by respondent. See *Susan Jo Russell,* 60 T.C. 942 (1973). We also note that the distinction between domestic and foreign affairs involved in "justiciability" may not be as clear where there is an allegation of connection with a specific criminal act constituting a war crime and not based upon the validity of national policy.

[6] It is sometimes said of persons who oppose government compulsion or prohibition on grounds of conscience that they should not be permitted to judge the legality of their own actions. This principle has force only if society is willing—except in exigent circumstances—to provide a forum in which that judgment can be made. See *United States v. Owens,* 415 F.2d 1308, 1316 (6th Cir. 1969), cert. denied 397 U.S. 997 (1970); *United States v. Berrigan,* 283 F. Supp. 336, 341-343 (D. Md. 1968), affd. 417 F.2d 1002, 1009 (4th Cir. 1969), cert. denied 397 U.S. 909 (1970).

[7] The substantive law of war crimes as applied at Nuremberg is found in the Charter of the International Military Tribunal, which condemned the following:

(a) CRIMES AGAINST PEACE: namely, planning, preparation, initiation or waging of a war of aggression, or a war in violation of international treaties, agreements or assurances, or participation in a common plan or conspiracy for the accomplishment of any of the foregoing;

(b) WAR CRIMES: namely, violations of the laws or customs of war. Such violations shall include, but not be limited to, murder, ill-treatment or deportation to slave labor or for any other purpose of civilian population of or in occupied territory, murder or ill-treatment of prisoners of war or persons on the seas, killing of hostages, plunder of public or private property, wanton destruction of cities, towns or villages, or devastation not justified by military necessity;

(c) CRIMES AGAINST HUMANITY: namely, murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war, or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated.

are declaratory of existing international criminal law. *United States v. Goering* (The Nurnberg Trial), 6 F.R.D. 69, 107-111 (International Military Tribunal 1946). The laws of war are enforceable within the United States. *Ex Parte Quirin,* 317 U.S. 1 (1942); *The Paquete Habana,* 175 U.S. 677 (1900). It is possible that the United States could not compel an individual to perform an act which would subject him to such personal criminal liability. See *Korematsu v. United States,* 323 U.S. 214, 220 (1944), and 323 U.S. at 232 (Roberts, *J.,* dissenting). Cf. *Levy v. Parker,* 478 F.2d 772, 796-797 (3d Cir. 1973), revd. on other grounds 417 U.S. 733 (1974); *Switkes v. Laird,* 316 F. Supp. 358 (S.D. N.Y. 1970). Here again, we need not resolve this issue, or the concomitant issue as to whether the enforcement of an obligation to pay taxes would constitute the required compulsion, since we believe that the Nuremberg precedents show that the act of paying taxes in wartime could not be considered complicity in any criminal act performed by the Government or its agents, whether the taxpayer knows of such acts or not.[8]

In time of war, virtually the entire loyal population is to some degree bound up in the struggle. While citizens may have a moral duty to seek an end to illegal Government acts by political means and to refuse to participate or directly assist in the commission of such acts, international law does not require them to abstain from all forms of cooperation with the Government in the meantime. To impose criminal sanctions on the taxpayer, the munitions worker, or the voter who casts his ballot for the Government would be both unfair and impractical. Bringing guilt and opprobrium upon the entire population of the offending State would run counter to the humane and reconciliatory purposes

---

Leaders, organizers, instigators and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such plan. [Agreement with the French Republic, the United Kingdom of Great Britain and Northern Ireland, and the Union of Soviet Socialist Republics respecting the prosecution and punishment of the major war criminals of the European Axis, Aug. 8 and Oct. 6, 1945, 59 Stat. 1544, 1547, E.A.S. 472.]

[8] Petitioners do not claim that paying taxes renders them participants in a common plan or conspiracy to commit crimes against peace within the meaning of the charter (n. 7 *supra*). In the light of the Nuremberg judgment, which limited liability for that crime to responsible leaders at the very highest level of government, such a claim would necessarily fail. See *United States v. Goering* (The Nurnberg Trial), 6 F.R.D. 69, 111-112, 144-145 (Reich Cabinet not a criminal organization), 155, 158, 160, 162, 164, 167, 172, 174, 177, 180, 182, 187 (individual defendants not sufficiently connected with the common plan or conspiracy).

which underlie the entire body of law.[9]

The view of the Nuremberg prosecutors on the responsibility of individual Germans for the nation's crimes may be gleaned from the opening statement made by the United States prosecutor, Mr. Justice Jackson:[10]

We charge guilt on planned and intended conduct that involves moral as well as legal wrong. And we do not mean conduct that is a natural and human, even if illegal, cutting of corners, such as many of us might well have committed had we been in the defendants' positions. It is not because they yielded to the normal frailties of human beings that we accuse them. It is their abnormal and inhuman conduct which brings them to this bar.

\* \* \*

We would also make clear that we have no purpose to incriminate the whole German people. We know that the Nazi Party was not put in power by a majority of the German vote. \* \* \*

Just as individual citizens escaped criminal culpability, so did the rank and file of the Nazi party, even though they may have had knowledge of their leaders' crimes. Thus, it was observed that, regarding horrendous actions against the Jews, the evidence "forbids us to believe that any person could be identified with any part of Nazi action without approving this most conspicuous item in their program" (2 Trial of the Major War Criminals Before the International Military Tribunal [T.M.W.C.] 119 (1947)) and that Germany's prewar military preparations "were of a magnitude which surpassed all need of defense, and every defendant, and every intelligent German, well understood them to be for aggressive purposes" (2 T.M.W.C. at 131).

Finally, Mr. Justice Jackson summarized the law of individual responsibility, as contained in the Charter of the International Military Tribunal:

The Charter also recognizes individual responsibility on the part of those who commit acts defined as crimes, or who incite others to do so, or who join a common plan with other persons, groups or organizations to bring about their commission. The principle of individual responsibility for piracy and brigandage, which have long been recognized as crimes punishable under international law, is old and well established. That is what illegal warfare is.

\* \* \*

\* \* \*

---

[9] See *State v. Marley*, 509 P. 2d 1095, 1110-1111 n. 17 (Hawaii 1973); Levinson, "Responsibility for Crimes of War," War and Moral Responsibility 104, 123 (Cohen, Nagel & Scanlon eds. 1974).

[10] 2 Trial of the Major War Criminals Before the International Military Tribunal [T.M.W.C.] 102 (1947).

Of course, we do not argue that the circumstances under which one commits an act should be disregarded in judging its legal effect. A conscripted private on a firing squad cannot expect to hold an inquest on the validity of the execution. The Charter implies common sense limits to liability * * *

The Charter also recognizes a vicarious liability, which responsibility is recognized by most modern systems of law, for acts committed by others in carrying out a common plan or conspiracy to which a defendant has become a party. * * * [2 T.M.W.C. at 149-151.]

The charter was not conceived as greatly expanding the principle of complicity in crime, an expansion which would be necessary to any finding of guilt on the part of petitioners. The tribunal itself was sensitive to the proper limits of criminal liability; in defining the criminality of membership in specified organizations, it said:

that definition should exclude persons who had no knowledge of the criminal purposes or acts of the organization and those who were drafted by the State for membership, unless they were personally implicated in the commission of acts declared criminal * * *. Membership alone is not enough * * * [6 F.R.D. at 132.]

The defendants Hess and Fritzsche, despite their high government positions, were acquitted of direct participation in war crimes and crimes against humanity. 6 F.R.D. at 150, 187.[11] It is inconceivable that a conviction could have been obtained of a defendant charged simply with paying his taxes to that same Government.

An American court has recognized the limited scope of personal criminal liability for war crimes, holding that mere membership in the Armed Forces by a draftee does not constitute complicity in their alleged illegal acts. *United States v. Valentine,* 288 F. Supp. 957 (D. P.R. 1968). Service in Vietnam by an Army psychiatrist, or training Special Forces medics for Vietnam service by an Army doctor, was not criminal without proof that such action was connected with specific war crimes or patterns of criminal conduct. *Levy v. Parker, supra; Switkes v. Laird, supra.* The link between intrinsically innocent behavior and any possible war crime was there, and is here, far too insubstantial to support an implication of guilt.

On the basis of the foregoing, we are satisfied that the rationales of *Abraham J. Muste, supra* (involving, to be sure, only the applicability of the first amendment), and our decision in *Susan Jo Russell, supra,* rest upon solid foundations which have

---

[11] Responsibility for war crimes committed by others was imputed to German Government officials almost entirely on the basis of their authority over the perpetrators. See Levinson, n. 9 *supra.*

been reinforced by subsequent judicial decisions. Similarly, we believe that any claim that petitioners may have that they partially satisfied their income tax obligation by payments to the Philadelphia War Tax Resistance Alternative Fund must fail. See *Autenreith v. Cullen, supra; Susan Jo Russell, supra.*

Petitioners seek an opportunity to present proof of the factual allegations made in the petitions. They are entitled to that opportunity only if it could result in a redetermination of the deficiencies found by respondent. In these cases, it would be useless for us to hear the proffered evidence, because we have concluded that the legal theories relied upon by petitioners to reduce their taxes are erroneous.

Respondent's motions will be granted and

> *Decision will be entered for the respondent in docket No. 5760-73.*

> *An appropriate order will be entered in docket No. 3690-75.*[12]

---

[12] In the petition in docket No. 3690-75, there is a general allegation of error on the part of respondent in disallowing a deduction of $250 for real estate taxes. Respondent has not yet filed an answer to the petition. Accordingly, our order will be limited to the arguments presented in respect of respondent's motion to dismiss and the case will be calendared for trial on the issue relating to the deduction of real estate taxes.