WM. KEITH TINGLE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7114–79.     Filed February 7, 1980.

Wm. Keith Tingle, pro se.
*Crombie J. D. Garrett,* for the respondent.

OPINION

SIMPSON, *Judge:* This matter is before us on the Commissioner's motion for judgment on the pleadings. The Commissioner determined a deficiency of $848 in the petitioner's Federal income tax for 1977. The only issue for decision is whether the petitioner is entitled to a "tax credit for conscientious objection to war" as a right retained by the people under the Ninth Amendment to the United States Constitution.

The petitioner, Wm. Keith Tingle, resided in Allentown, Pa., at the time he filed the petition in this case. He filed his Federal income tax return for 1977 with the Internal Revenue Service. On such return, the petitioner claimed $848 as a "tax credit" to protest the amount of his Federal income taxes which he estimated was allocable to military expenditures. In his statutory notice of deficiency, the Commissioner disallowed such tax credit on the ground that the Internal Revenue Code did not allow a credit for the conscientious objection to war.

The Commissioner filed a motion for judgment on the pleadings on the ground that he was entitled to judgment as a matter of law on the undisputed facts appearing from the pleadings. The petitioner filed a memorandum in opposition to the Commissioner's motion, and a hearing was held on such motion in Philadelphia, Pa. The parties presented both oral and written arguments on the matter.

In his memorandum in opposition to the Commissioner's motion for judgment on the pleadings, the petitioner maintains that the cases on which the Commissioner relies in support of his motion do not consider his contention that actions based on conscience are protected by the Ninth Amendment "as a right retained by the people." He contends that the Ninth Amendment was incorporated into the Constitution to emphasize that the American people have natural and civil rights beyond those specifically enumerated in the first eight amendments of the Bill of Rights, and that one of those rights, safeguarded by the Ninth Amendment, is the right to obey moral conscience. As such, he claims that his tax credit for conscientious objection to war supersedes "the regulations of the Internal Revenue Service which are subordinate to the United States Constitution." We must disagree with the petitioner for his contentions regarding the effect of the Ninth Amendment are misguided.

The Ninth Amendment to the United States Constitution provides:

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

A brief review of the history, purpose, and enactment of the Ninth Amendment reveals that at the time the delegates met to draft the Constitution in Philadelphia in the spring of 1787, few of them believed that a bill of rights should be included in the new Constitution. Rather, the framers believed that political and social rights of individuals flowed from a natural law which limits the reach of any established political authority, that these rights were inalienable and essential to human existence, and that they could not be affected nor abridged by governmental action. However,

To the surprise of most of the framers, the omission of a bill of rights proved to be the greatest single obstacle to ratification of the Constitution. Both Federalists and Antifederalists[16]objected to its absence, although the Federalists, intent on securing adoption, attempted to explain away this defect by arguing that the Constitution in no way affected the inherent rights of individuals. In a speech in Philadelphia just after the Convention ended, James Wilson summarized the Federalist viewpoint: "[I]t would have been superfluous and absurd, to have stipulated with a federal body of our own creation, that we should not enjoy those privileges, of which we are not divested either by the intention or the act that has brought that body into existence."

But the explanation by a rich Philadelphia lawyer of the niceties of natural law philosophy made little impression on the Antifederalists. To them the Constitution created a powerful new government that might easily abuse its powers; better to provide too many precautions than too few. They argued that by failing to limit the powers of the federal government, the rights of the people had been impliedly surrendered. James Winthrop of Massachusetts, for example, insisted that: "When the people institute government, they of course delegate all rights not expressly reserved."

The ninth amendment had its genesis in the Federalist answer to this argument. The Federalists insisted that if a bill of rights were written, the fears of the Antifederalists would be realized, for an imperfect enumeration of rights would imply that other rights had indeed been given up to the federal government. * * *

---

[16] The terms "Federalist" and "Antifederalist" are used here as a shorthand form of expression. A Federalist is one who favored the ratification of the Constitution; an Antifederalist is one who for any reason opposed the new system of government embodied in the Constitution. * * *

[Comment, "The Uncertain Renaissance of the Ninth Amendment," 33 U. Chi. L. Rev. 814, 817–818 (1966); other fn. refs. omitted.]

Therefore, the Federalists perceived the new government as one

of enumerated powers, and, as long as no contrary inferences prevailed, the government would have no power to interfere with the exercise of individual rights. See L. Dunbar, "James Madison and the Ninth Amendment," 42 Va. L. Rev. 627 (1956).

Some of the more influential Antifederalist delegates to the Virginia convention to ratify the Constitution, however, were insistent on a bill of rights and wanted to make ratification of the Constitution conditional on the passage of the amendments in the first session of Congress. James Madison, a leading Federalist spokesman, feared the impact such a conditional ratification would have on other States. He therefore promised the delegates that he would submit the desired amendments to the first Congress if they would ratify the Constitution in its then form. "The promise to seek amendments apparently shifted the votes of enough delegates to permit ratification by a narrow margin. A number of proposed amendments and a suggested bill of rights were attached to the resolution of ratification, with the request that Congress consider and enact them." 33 U. Chi. L. Rev. at 819–820.

After the Constitution had been ratified, and the House of Representatives had been assembled, Mr. Madison submitted several amendments to the Constitution.

The original proposal for the ninth amendment read:

"The exceptions here or elsewhere in the constitution, made in favor of particular rights, shall not be so construed as to diminish the just importance of other rights retained by the people, or as to enlarge the powers delegated by the constitution; but either as actual limitations of such powers, or as inserted merely for greater caution."

In his introductory remarks, Madison stated, in reference to the above proposal:

"It has been objected also against a bill of rights, that, by enumerating particular exceptions to the grant of power, it would disparage those rights which were not placed in that enumeration; and it might follow, by implication, that those rights which were not singled out, were intended to be assigned into the hands of the General Government, and were consequently insecure. This is one of the most plausible arguments I have ever heard urged against the admission of a bill of rights into this system; but, I conceive, that it may be guarded against . . . [by the proposed amendment]."

Eventually the House formed a select committee, of which Madison was a member, to review the proposals. While the amendment was in committee it underwent an important revision. Madison's original proposal had contained two parts, the second of which stated that the enumeration of certain rights should not be construed "to enlarge the powers delegated by the constitution."

This section was stricken in the select committee, which reported back the ninth amendment in virtually final form: "The enumeration in this Constitution of certain rights shall not be construed to deny or disparage others retained by the people."

[33 U. Chi. L. Rev. at 820–821; fn. refs. omitted.]

The Ninth Amendment thus represented an endeavor to preserve the underlying theory of the framers of the Constitution that individual rights exist independently of government, and to negate the Federalist argument that the enumeration of certain rights would imply the forfeiture of others. See L. Dunbar, *supra* at 631.

The petitioner, in support of his argument that the Ninth Amendment safeguards the right to obey moral conscience, quotes from a letter Mr. Madison wrote to Thomas Jefferson in 1788 in which Mr. Madison wrote:

There is a great reason to fear that a positive declaration of some of the most essential rights could not be obtained in the requisite latitude. I am sure that the rights of conscience, in particular, if submitted to public definition would be narrowed much more than they are likely to be by an assumed power.

However, Mr. Madison's statement does not go so far as the petitioner infers. In discussing the precise letter, quoted by the petitioner, a commentator has stated: "Madison's fear was simply that definitions of specific rights which required ratification by Congress and the states might not be as broadly stated as he would prefer." (33 U. Chi. L. Rev. at 824.) As another commentator has written regarding the intent and purpose of the acknowledged "author" of the Ninth Amendment:

Madison had wanted guarantees of procedural decency and a declaration of the rights of conscience. What he further proposed, and what he got in abbreviated form in the ninth amendment, was an affirmation of the principle that, as rights in the United States are not created by government, so they are not to be diminished by government, unless by the appropriate exercise of an express power. [L. Dunbar, *supra* at 637–638.]

The petitioner's claim of conscience runs into direct conflict with the express power to levy and collect taxes. Article I, section 8, of the Constitution specifically provides that the Congress shall have power to lay and collect taxes, to provide for the common defense and general welfare of the United States, and to provide for and maintain an Army and a Navy. This article and the 16th Amendment to the Constitution empower the Congress to lay and collect taxes on incomes from whatever

source derived. In exercising such authority, Congress has imposed a tax on incomes and has made no exceptions for those persons who have moral or conscientious objections to the use of the taxes so collected. The Supreme Court in the landmark case of *Massachusetts v. Mellon*, 262 U.S. 447 (1923), held that the interest of a taxpayer in the moneys of the Federal Treasury are too indeterminate, remote, uncertain, and indirect to furnish a basis for appeal to the preventive powers of that Court regarding the manner of their expenditure. Moreover, it is a well-established principle of tax law that deductions are a matter of legislative grace and are not allowable unless Congress has specially provided for them. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934).

Although this Court has not previously considered a refusal to pay taxes based on the claim that the Ninth Amendment preserved one's right to do so, this and other courts have considered a host of cases in which taxpayers have sought to rely on the rights of freedom of speech, freedom of religion, and other rights expressly guaranteed by the Constitution or other laws, and the courts have uniformly held that such claims do not relieve a person from the requirement of paying taxes. *Lull v. Commissioner*, 602 F.2d 1166 (4th Cir. 1979), affg. per curiam T.C. Memo. 1978–74 and *Herby v. Commissioner*, T.C. Memo. 1978–119, cert. denied 444 U.S. 1014 (1980); *First v. Commissioner*, 547 F.2d 45 (7th Cir. 1976), affg. per curiam a Memorandum Opinion of this Court; *Authenrieth v. Cullen*, 418 F.2d 586 (9th Cir. 1969), cert. denied 397 U.S. 1036 (1970); *Kalish v. United States*, 411 F.2d 606 (9th Cir. 1969), cert. denied 396 U.S. 835 (1969); *Farmer v. Rountree*, 149 F. Supp. 327 (M.D. Tenn. 1956), affd. per curiam 252 F.2d 490 (6th Cir. 1958), cert. denied 357 U.S. 906 (1958); *Anthony v. Commissioner*, 66 T.C. 367 (1976); *Scheide v. Commissioner*, 65 T.C. 455 (1975); *Egnal v. Commissioner*, 65 T.C. 255 (1975); *Russell v. Commissioner*, 60 T.C. 942 (1973); *Muste v. Commissioner*, 35 T.C. 913 (1961).

In *Muste v. Commissioner, supra,* this Court held that a taxpayer does not have the right to refuse to comply with the law because it is not in accord with the dictates of his conscience. The Court stated:

There is no doubt as to the sincerity of the petitioner's beliefs, but in our opinion he does not have the right to refuse to comply with the law, even though the policies of the Federal Government and the manner of expenditure

of its revenues may not accord with the dictates of his conscience or religion. [35 T.C. at 919; fn. ref. omitted.]

The Court of Appeals for the Ninth Circuit stated in *Autenrieth v. Cullen:*

If every citizen could refuse to pay all or part of his taxes because he disapproved of the government's use of the money * * * the ability of the government to function could be impaired or even destroyed. * * * There are few, if any, governmental activities to which some person or group might not object * * * [418 F.2d at 588–589.]

Although the petitioner seeks to rely upon the Ninth Amendment, his claim, in essence, is no different from those already repeatedly considered by this and other courts, and it has no more merit than those other claims.

Lastly, the petitioner's claim that he is distributing to various charities and to a "war tax resistance life fund" the portion of his income taxes which would be appropriated to the military does not relieve him of his tax liability. This Court has considered and rejected such a contention in previous cases. *Egnal v. Commissioner*, 65 T.C. at 263 (alleged partial tax payment by petitioners to Philadelphia War Tax Resistance Alternative Fund did not relieve them of their income tax obligation); *Russell v. Commissioner*, 60 T.C. at 947 (alleged payment of an alternative tax to the community had no bearing on the tax liability of the petitioner).

For these reasons, the Commissioner's motion for judgment on the pleadings is granted since there is no genuine issue as to any material fact. *Anthony v. Commissioner*, 66 T.C. at 373; *Egnal v. Commissioner*, 65 T.C. at 263. We therefore sustain the deficiency determined by the Commissioner for the year in issue.

In conclusion, we feel obligated to comment on the petitioner's statement that the need for his claim would be obviated by the enactment of the World Peace Tax Fund. As we have stated time and again, this Court is not a "forum for protest" for a taxpayer's objections to this country's military appropriations. This Court has before it a large number of cases which deserve careful consideration as speedily as possible, and "protest" cases needlessly disrupt our consideration of those genuine controversies. General grievances against the policies of the Government, or against the tax system as a whole, are not the types of

controversies to be resolved in the courts; Congress is the appropriate body to which such matters should be referred.

> *An appropriate order and decision will be entered.*