· No. 42, Orig. MASSACHUSETTS *v.* LAIRD, SECRETARY OF DEFENSE. Motion of Constitutional Lawyers'· Committee· on Undeclared War for leave to file supplemental brief as *amicus curiae* granted. Motion of John M. Wells et al. for leave to ·file a brief as *amici curiae,* to participate in oral argument, or alternative motion to be named as· parties plaintiff, denied. Motion for leave to file bill of complaint denied. MR. JUSTICE HARLAN and . MR. JUSTICE STEWART dissent. They would set the latter motion for argument on questions of standing and justiciability.

MR. JUSTICE DOUGLAS, dissenting.

This motion was filed by the Commonwealth of Massachusetts against the Secretary of Defense, a citizen of another State. It is brought pursuant to a mandate contained in an act of the Massachusetts Legislature. 1970 Laws, .c. 174. Massachusetts seeks to obtain an · adjudication of the constitutionality of the United States' participation in the Indochina war. It requests that the United States' participation be declared "unconstitutional in that it was not initially authorized or subsequently ratified by Congressional declaration"; it asks that the Secretary of Defense be enjoined "from carrying out, issuing or causing to be issued any further orders which would increase the present level of United States troops in Indochina"; and it asks that, if appropriate congressional action is not forthcoming within 90 days of this Court's decree, the Secretary of Defense be enjoined "from carrying out, issuing, or causing to be issued any further orders directing any inhabitant of the Commonwealth of Massachusetts to Indochina for the purpose of participating in combat or supporting combat troops in the Vietnam war." Today this Court denies leave to file the complaint. I dissent.

The threshold issues for granting leave to file a complaint in this case are standing and justiciability. I believe that Massachusetts has standing and the controversy is justiciable. At the very least, however, it is apparent that the issues are not so clearly foreclosed as to justify a summary denial of leave to file.

## STANDING

In *Massachusetts* v. *Mellon,* 262 U. S. 447 (hereafter *Mellon*), the Court held that a State lacked standing to challenge, as *parens patriae,* a federal grant-in-aid program under which the Federal Government was allegedly usurping powers reserved to the States. It was said in *Mellon:*

> "[T]he citizens of Massachusetts are also citizens of the United States. It cannot be conceded that a State, as *parens patriae,* may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. While the State, under some circumstances, may sue in that capacity for the protection of its citizens (*Missouri* v. *Illinois,* 180 U. S. 208, 241), it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as *parens patriae,* when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status." *Id.,* at 485–486.

The Solicitor General argues that *Mellon* stands as a bar to this suit.

Yet the ruling of the Court in that case is not dispositive of this one. The opinion states: "We need not go so far as to say that a State may never intervene by

suit to protect its citizens against any form of enforcement of unconstitutional acts of Congress; but we are clear that the right to do so does not arise here." *Id.*, at 485. Thus the case did not announce a *per se* rule to bar all suits against the Federal Government as *parens patriae*, and a closer look at the bases of the opinion is necessary to determine the limits on its applicability.

*Mellon* relates to an Act of Congress signed by the Executive, a distinction noted in other original actions. In *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, we stated, "[t]his is not a suit like those in *Massachusetts* v. *Mellon*, and *Florida* v. *Mellon, supra*, [273 U. S. 12] where a State sought to protect her citizens from the operation of federal statutes." *Id.*, at 446–447.

Massachusetts attacks no federal statute. In fact, the basis of Massachusetts' complaint is the absence of congressional action.

It is said that the Federal Government "represents" the citizens. Here the complaint is that only one representative of the people, the Executive, has acted and the other representatives of the citizens have not acted, although, it is argued, the Constitution provides that they must act before an overseas "war" can be conducted.

There was a companion case to *Mellon* in which the Court held that a taxpayer lacked standing to challenge the same federal spending statute. *Frothingham* v. *Mellon*, 262 U. S. 447 (hereafter *Frothingham*). Two years ago we reconsidered *Frothingham* and found at least part of the ruling could not stand the test of time. Concurring in the result, I stated:

> "*Frothingham*, decided in 1923, was in the heyday of substantive due process, when courts were sitting in judgment on the wisdom or reasonableness of legislation. The claim in *Frothingham* was that a

federal regulatory Act dealing with maternity deprived the plaintiff of property without due process of law. When the Court used substantive due process to determine the wisdom or reasonableness of legislation, it was indeed transforming itself into the Council of Revision which was rejected by the Constitutional Convention. It was that judicial attitude, not the theory of standing to sue rejected in *Frothingham,* that involved 'important hazards for the continued effectiveness of the federal judiciary,' to borrow a phrase from my Brother HARLAN. A contrary result in *Frothingham* in that setting might well have accentuated an ominous trend to judicial supremacy." *Flast* v. *Cohen,* 392 U. S. 83, 107.

In *Flast* we held that a taxpayer had standing to challenge a federal spending program, if he showed that Congress breached a specific limitation on its taxing and spending power. As MR. JUSTICE STEWART stated in his concurring opinion, "[t]he present case is thus readily distinguishable from *Frothingham* v. *Mellon,* 262 U. S. 447, where the taxpayer did not rely on an explicit constitutional prohibition but instead questioned the scope of the powers delegated to the national legislature by Article I of the Constitution." 392 U. S., at 114.

The erosion of *Frothingham* does not, of course, necessarily mean that the authority of *Mellon* has been affected. But if the current debate over *Frothingham* "suggests that we should undertake a fresh examination of the limitations upon standing to sue," 392 U. S., at 94, then surely the erosion of *Frothingham* suggests it is time to re-examine its companion case.

*Mellon,* too, has been eroded by time. In the spring of 1963 the Governor of Alabama moved for leave to file

a complaint to prevent the President from using troops in Birmingham during civil rights marches there. Under the Solicitor General's reading of *Mellon* Alabama would have lacked standing to challenge such an exercise of presidential authority. The Court denied Alabama relief, not because of *Mellon*, but because:

> "In essence the papers show no more than that the President has made ready to exercise the authority conferred upon him by 10 U. S. C. § 333 by alerting and stationing military personnel in the Birmingham area. Such purely preparatory measures and their alleged adverse general effects upon the plaintiffs afford no basis for the granting of any relief." *Alabama* v. *United States,* 373 U. S. 545.

In *South Carolina* v. *Katzenbach,* 383 U. S. 301, *Mellon* was further weakened. In that case we denied standi g to South Carolina to assert claims under the Bill of Attainder Clause of Art. I and the principle of separation of powers which were regarded "only as protections for individual persons and private groups, those who are peculiarly vulnerable to nonjudicial determinations of guilt." 383 U. S., at 324. Yet we went on to allow South Carolina to challenge the Voting Rights Act of 1965 as beyond congressional power under the Fifteenth Amendment.

The main interest of South Carolina was in the continuing operation of its election laws. Massachusetts' claim to standing in this case is certainly as strong as South Carolina's was in the *Katzenbach* case.

Massachusetts complains, as *parens patriae,* that its citizens are drafted and sent to fight in an unconstitutional overseas war. Their lives are in jeopardy. Their liberty is impaired.

Furthermore, the basis on which *Flast* distinguished *Frothingham* is also present here. The allegation in

both *Mellon* and *Frothingham* was that Congress had exceeded the general powers delegated to it by Art. I, § 8, and invaded the reserved powers of the States under the Tenth Amendment. The claim was not specific; but, as *Flast* held, if a taxpayer can allege spending violates a *specific constitutional limitation,* then he has standing. Here Massachusetts points to a specific provision of the Constitution. Congress by Art. I, § 8, has the power "To declare War." Does not that make this case comparable to *Flast?*

It has been settled, at least since 1901, that "if the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them," *Missouri* v. *Illinois,* 180 U. S. 208, 241, in an original action in this Court. And see *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 237–238; *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 591–592; *North Dakota* v. *Minnesota,* 263 U. S. 365, 372–376; *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439, 450–451. Those cases involved injury to inhabitants of one State by water or air pollution of another State, by interference with navigation, by economic losses caused by an out-of-state agency, and the like. The harm to citizens of Massachusetts suffered by being drafted for a war are certainly of no less a magnitude. Massachusetts would clearly seem to have standing as *parens patriae* to represent, as alleged in its complaint, its male citizens being drafted for overseas combat in Indochina.

## JUSTICIABILITY

A question that is "political" is opposed to one that is "justiciable." In reviewing the dimensions of the "political" question we said in *Baker* v. *Carr,* 369 U. S. 186, 217:

"Prominent on the surface of any case held to involve a political question is found a textually

demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

1. *A textually demonstrable constitutional commitment of the issue to a coordinate political department.* At issue here is the phrase in Art. I, § 8, cl. 11: "To declare War." Congress definitely has that power. The Solicitor General argues that only Congress can determine whether it has declared war. He states, " 'To declare War' includes a power to determine, free of judicial interference, the form which its authorization of hostilities will take." This may be correct. But, as we stated in *Powell* v. *McCormack,* 395 U. S. 486, the question of a textually demonstrable commitment and "what is the *scope* of such commitment are questions [this Court] must resolve for the first time in this case." *Id.,* at 521 (emphasis added). It may well be that it is for Congress, and Congress alone, to determine the form of its authorization, but if that is the case we should make that determination only after full briefs on the merits and oral argument.

2. *A lack of judicially discoverable and manageable standards for resolving the issue.* The standards that are applicable are not elusive. The case is not one where

·the Executive is repelling a sudden attack.[1]   The present Indochina "war" has gone on for six years.   The question is whether the Gulf of Tonkin Resolution was a declaration of war or whether other Acts of Congress were its equivalent.

3. *The impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion.*   In *Ex parte Milligan,* 4 Wall. 2, 139 (concurring opinion), it was stated that "neither can the President, in war more than in peace, intrude upon the proper authority of Congress . . . ."[2]   The issue in this case is not whether we ought to fight a war in Indochina, but whether the Executive can authorize it without congressional authorization.   This is not a case where we would have to determine the wisdom of any policy.

4. *The impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government.*   The Solicitor General argues that it would show disrespect of the Executive to go behind his statements and determine his au-

---

[1] An early draft of the Constitution vested in Congress the power to "make" war rather than the power to "declare" war.  The change from "make" to "declare" was intended to authorize the President the power to repel sudden attacks and to manage, as Commander in Chief, any war declared by Congress.  The change was not intended to give the President power to initiate hostilities and commit troops in war at his own will.  The Framers were afraid of unlimited executive power and "resolved to so frame the Constitution that no one man should hold the power of bringing this oppression upon us."  A. Lincoln as quoted in E. Corwin, The President: Office & Powers, 1787–1957, p. 451 (4th ed. 1957).  See generally Note, Congress, the President, and the Power to Commit Forces to Combat, 81 Harv. L. Rev. 1771 (1968).

[2] The majority in *Milligan* stated: "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances."  4 Wall., at 120–121.

thority to act in these circumstances. Both *Powell* and the *Steel Seizure Case* (*Youngstown Sheet & Tube* v. *Sawyer*, 343 U. S. 579), however, demonstrate that the duty of this Court is to interpret the Constitution, and in the latter case we did go behind an executive order to determine his authority. As Mr. Justice Frankfurter stated in the *Steel Seizure Case:*

> "To deny inquiry into the President's power in a case like this, because of the damage to the public interest to be feared from upsetting its exercise by him, would in effect always preclude inquiry into challenged power, which presumably only avowed great public interest brings into action. And so, with the utmost unwillingness, with every desire to avoid judicial inquiry into the powers and duties of the other two branches of the government, I cannot escape consideration of the legality of Executive Order No. 10340.

> .       .       .       .       .

> "Marshall's admonition that 'it is *a constitution* we are expounding' [*McCulloch* v. *Maryland*, 4 Wheat. 316, 407] is especially relevant when the Court is required to give legal sanctions to an underlying principle of the Constitution—that of separation of powers." 343 U. S., at 596–597 (concurring opinion).

It is far more important to be respectful to the Constitution than to a coordinate branch of government.[3]

5. *An unusual need for unquestioning adherence to a political decision already made.* This test is essentially

---

[3] "When all is said and done, one is inclined to think that a rigid constitutional frame is on the whole preferable even if it serves no better purpose than to embarrass an overactive Executive." G. Hausner, Individual Rights in the Courts of Israel, International Lawyers' Convention in Israel 201, 228 (1958).

a reference to a commitment of a problem and its solution to a coordinate branch of government[4]—a matter not involved here.

---

[4] The classic political questions case is *Luther* v. *Borden*, 7 How. 1, growing out of the Dorr Rebellion in Rhode Island. That State had been unaffected by the constitutional changes during the Revolutionary War and when Connecticut acquired a new constitution in 1818, Rhode Island was the only State which retained its original colonial charter as fundamental law. The charter government was malapportioned and required ownership of $134 of real property for voting purposes.

From the early 1820's on there was agitation for a new constitution in Rhode Island. Finally one constitution put to the "voters" was passed. A "people's" convention on November 18, 1841, put forth a new constitution with a Bill of Rights, better apportionment, and white manhood suffrage. Under the voting requirements established by that constitution, all white adult males were allowed to vote for or against the "people's" constitution. A majority of the voters ratified the constitution. Following the ratification, elections were held. Rhode Island then had two governments, one under the "people's" constitution, the other under the original charter. The "people's" government had a quick legislative session and did not attempt to change either the judiciary or the administrative officers of the State. On June 26, 1842, the charter governor finally proclaimed martial law to establish his authority. *Luther* v. *Borden* arose out of Borden's attempt pursuant to instructions to arrest Luther. Luther brought action in the federal courts for trespass and Borden defended his actions as taken under martial law, lawfully proclaimed. Judge Story refused to give Luther's requested jury instructions, that the "people's" constitution was in full force in June 1842 because "a majority of the free white male citizens of Rhode Island, of twenty-one years and upwards, had a right to reassume the powers of government and establish a written constitution; and that, having so exercised such right, the pre-existing charter government became null and void." The case then went to the Supreme Court and, faced with the question of which of the two governments was the lawful one, the Court held that determination was a political question, not for judicial determination—that the political question was for Rhode Island

6. *The potentiality of embarrassment from multi-farious pronouncements by various departments of government on one question.* Once again this relates back to whether the problem and its solution are committed to a given branch of government.

We have never ruled, I believe, that when the Federal Government takes a person by the neck and submits him to punishment, imprisonment, taxation, or to some ordeal, the complaining person may not be heard in court. The rationale in cases such as the present is that government cannot take life, liberty, or property of the individual and escape adjudication by the courts of the legality of its action.

That is the heart of this case. It does not concern the wisdom of fighting in Southeast Asia. Likewise no question of whether the conflict is either just or necessary is present. We are asked instead whether the Executive has power, absent a congressional declaration of war, to commit Massachusetts citizens to armed hostilities on foreign soil. Another way of putting the question is whether under our Constitution presidential wars are permissible. Should that question be answered in the negative we would then have to determine whether Congress has declared war. That question which Massachusetts presents is in my view justiciable.

---

to resolve or for Congress under Art. IV, § 4, of the Constitution, 7 How., at 38–43.

Dorr, who had been the governor under the "people's" constitution, was tried and convicted of treason against the State in early 1844. In January he was offered a legislative pardon if he would take an oath affirming support for the government in power. He refused since he believed the "people's" constitution was still binding. In June 1845, he was unconditionally pardoned under a new governor. Finally, in February 1854, the legislature reversed and annulled Dorr's conviction. For a history of the Dorr Rebellion, see A. Mowry, The Dorr War (1970).

It is said that "the notion has persisted, despite the results in *Baker v. Carr* and *Powell v. McCormack*, [395 U. S. 486] . . . . that there is a means for the Court to avoid deciding any case or issue upon the basis of a broad, highly general, and almost entirely discretionary principle of nondecision." Tigar, Judicial Power, The "Political Question Doctrine," and Foreign Relations, 17 U. C. L. A. L. Rev. 1135, 1163 (1970). Yet no such discretionary principle, if germane to our problem, is applicable here.

"The war power of the United States, like its other powers . . . . is subject to applicable constitutional limitations." *Hamilton* v. *Kentucky Distilleries & Warehouse Co.*, 251 U. S. 146, 156. No less than the war power—the greatest leveler of them all—is the power of the Commander in Chief subject to constitutional limitations. That was the crux of the *Steel Seizure Case*. Concurring in the judgment in that case, Mr. Justice Clark stated: "I conclude that where Congress has laid down specific procedures to deal with the type of crisis confronting the President, he must follow those procedures in meeting the crisis . . . . I cannot sustain the seizure in question because . . . Congress had [*sic*] prescribed methods to be followed by the President . . . ." 343 U. S., at 662. If the President must follow procedures prescribed by Congress, it follows *a fortiori* that he must follow procedures prescribed by the Constitution.

This Court has previously faced issues of presidential war making. The legality of Lincoln's blockade was considered in the *Prize Cases*, 2 Black 635, and although the Court narrowly split in supporting the President's position, the split was on the merits, not on whether the claim was justiciable. And even though that war was the Civil War and not one involving an overseas expedition, the decision was 5 to 4.

898

In the *Steel Seizure Case* members of this Court wrote seven opinions and each reached the merits of the Executive's seizure. In that case, as here, the issue related to the President's powers as Commander in Chief and the fact that all nine Justices decided the case on the merits and construed the powers of a coordinate branch at a time of extreme emergency should be instructive. In that case we said:

> "It is clear that if the President had authority to issue the order he did, it must be found in some provision of the Constitution. And it is not claimed that express constitutional language grants this power to the President. The contention is that presidential power should be implied from the aggregate of his powers under the Constitution. Particular reliance is placed on provisions in Article II which say that 'The executive Power shall be vested in a President . . .'; that 'he shall take Care that the Laws be faithfully executed'; and that he 'shall be Commander in Chief of the Army and Navy of the United States.'
>
> "The order cannot properly be sustained as an exercise of the President's military power as Commander in Chief of the Armed Forces. The Government attempts to do so by citing a number of cases upholding broad powers in military commanders engaged in day-to-day fighting in a theater of war. Such cases need not concern us here. Even though 'theater of war' be an expanding concept, we cannot with faithfulness to our constitutional system hold that the Commander in Chief of the Armed Forces has the ultimate power as such to take possession of private property in order to keep labor disputes from stopping production. This is a job for the Nation's lawmakers, not for its military authorities." 343 U. S., at 587.

If we determine that the Indochina conflict is unconstitutional because it lacks a congressional declaration of war, the Chief Executive is free to seek one, as was President Truman free to seek congressional approval after our *Steel Seizure* decision.

There is, of course, a difference between this case and the *Prize Cases* and the *Steel Seizure Case*. In those cases a private party was asserting a wrong to him: his *property* was being taken and he demanded a determination of the legality of the taking. Here the *lives* and *liberties* of Massachusetts citizens are in jeopardy. Certainly the Constitution gives no greater protection to *property* than to *life* and *liberty*. It might be argued that the authority in the *Steel Seizure Case* was not textually apparent in the Constitution, while the power of the Commander in Chief to commit troops is obvious and therefore a different determination on justiciability is needed. The *Prize Cases*, however, involved Lincoln's exercise of power in ordering a blockade by virtue of his powers as the Commander in Chief.

Since private parties—represented by Massachusetts as *parens patriae*—are involved in this case, the teaching of the *Prize Cases* and the *Steel Seizure Case* is that their claims are justiciable.

The Solicitor General urges that no effective remedy can be formulated. He correctly points out enforcing or supervising injunctive relief would involve immense complexities and difficulties. But there is no requirement that we issue an injunction. Massachusetts seeks declaratory relief as well as injunctive relief. In *Baker* v. *Carr* we stated that we must detemine whether "the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." 369 U. S., at 198. The Declaratory Judgment Act, 28 U. S. C. § 2201, provides that "any court of the United States . . .

may declare the rights . . . of any interested party . . . whether or not further relief is or could be sought." It may well be that even declaratory relief would be inappropriate respecting many of the numerous issues involved if the Court held that the war were unconstitutional. I restrict this opinion to the question of the propriety of a declaratory judgment that no Massachusetts man can be taken against his will and made to serve in the war. *Powell* involved just one man while this case involves large numbers of men. But that goes only to the mechanical task of making any remedy granted available to all members of a large class.

Today we deny a hearing to a State which attempts to determine whether it is constitutional to require its citizens to fight in a foreign war absent a congressional declaration of war. Three years ago we refused to hear a case involving draftees who sought to prevent their shipment overseas. *Mora* v. *McNamara,* 128 U. S. App. D. C. 297, 387 F. 2d 862, cert. denied, 389 U. S. 934 (1967). The question of an unconstitutional war is neither academic nor "political." This case has raised the question in an adversary setting. It should be settled here and now.

I would set the motion for leave to file down for argument and decide the merits only after full argument.