**UNITED STATES of America**

v.

**William BRAINER.**

**Crim. No. Y–80–0253.**

United States District Court,
D. Maryland.

June 4, 1981.

**15.** 503 F.Supp. at 198.  **16.** *Id.*

Russell T. Baker, Jr., U. S. Atty., D. Md., and Steven A. Allen, Asst. U. S. Atty., D. Md., Baltimore, Md., for plaintiff.

Gerald A. Kroop, Baltimore, Md., for defendant.

## MEMORANDUM OPINION AND ORDER

### JOSEPH H. YOUNG, District Judge.

The defendant, William Brainer, filed a motion to dismiss the indictment in this case for lack of a speedy trial. He made no allegation that he was denied his constitutional right to a speedy trial under the Sixth Amendment but relied entirely upon the lack of compliance with the statutorily mandated time limits set forth in the Speedy Trial Act of 1974, as amended, 18 U.S.C. §§ 3161 *et seq.* [hereinafter, the "Act"]. Specifically, the defendant asserted that his trial on the scheduled date would result in a violation of 18 U.S.C. § 3161(c)(1) which, according to its terms, would have required the trial to commence within seventy days from the date the defendant appeared before a judicial officer of this court. In its response, the government conceded that the defendant's trial did not begin within the time prescribed by the Act, but argued that the motion to dismiss the indictment should be denied for the reason that the Speedy Trial Act is an unconstitutional legislative encroachment on the Judiciary and violates the principle of separation of powers. For the reasons set forth below, this Court denied the motion of the defendant who was then found guilty in a jury-waived trial on the basis of a stipulated set of facts.

The defendant was indicted on July 2, 1980, along with three other defendants, on the basis of his alleged participation in a violation of federal narcotics laws. This particular defendant was charged solely in Count One of the five count indictment, that count charging all four defendants with conspiracy to possess with intent to distribute marihuana and methaqualone in violation of 21 U.S.C. § 846. The defendant was not apprehended until January 19, 1981. In the meantime, one of the co-defendants, Richard C. Way, had pleaded guilty to one count of the indictment as part of an agreement with the government to testify at the trial(s) of the other defendants. The other two co-defendants, Clifford A. Goad and Edward J. Audy, were acquitted in a trial by jury.

Following the apprehension of defendant Brainer in the State of Washington on January 19, 1981, he was transported to the District of Maryland where he first appeared before a judicial officer on January 30, 1981, at which time bail was set. The defendant was arraigned on February 13, 1981, and trial was scheduled to begin on April 20, 1981.

The Speedy Trial Act provides that a criminal defendant must be brought to trial within seventy days from the date he has appeared before a judicial officer of the court in which such charge is pending:

> "(c)(1) In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs."

18 U.S.C. § 3161(c)(1). Failure to comply with these time dictates calls for mandatory sanctions under the terms of the Act. Section 3162(a)(2) expressly provides, in relevant part:

> "(2) If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant."

18 U.S.C. § 3162(a)(2).

Under the circumstances of defendant Brainer's proceedings, the last date on which his trial could have started without violating the terms of the Speedy Trial Act

was April 10, 1981 (seventy days after the initial appearance on January 30, 1981). The trial, which was scheduled for April 20, 1981, could not be commenced by that date because of previously scheduled matters before this Court. Furthermore, there were no periods of delay in this case which could be excluded under the provisions of 18 U.S.C. § 3161(h) so as to bring the April 20, 1981 date within the time limits of the statute.

Although the terms of the Speedy Trial Act call for the dismissal of the indictment in this case, that drastic result is not compelled because the Act itself constitutes an unconstitutional encroachment upon the Judiciary.

The constitutional principle of the separation of powers is implicit in the basic structure of our Constitution. The doctrine has been recognized from the founding days of our government and the Framers fully approved Montesquieu's view that the maintenance of independence as between the Legislative, the Executive and the Judicial Branches provided a security for the people. Madison in the Convention, 2 Farrand, Records of the Federal Convention, 56. Five of the Federalist Papers, numbers 47 through 51, were devoted to an exploration of the doctrine of separation of powers and the principle has continued to maintain its vitality as a "basic concept" in our constitutional scheme of government. *United States v. Nixon,* 418 U.S. 683, 704, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974); *see also, Buckley v. Valeo,* 424 U.S. 1, 120–123, 96 S.Ct. 612, 682–684, 46 L.Ed.2d 659 (1976), and *Nixon v. Administrator of General Services,* 433 U.S. 425, 442–443, 97 S.Ct. 2777, 2789–2790, 53 L.Ed.2d 867 (1977).

■ The separation of powers within the government was never intended, nor has it proven to be, complete. A system of checks and balances was included in the scheme to prevent one branch from predominating. *See* Federalist Paper No. 51. In interpreting the separation of powers doctrine, the Supreme Court has recognized the need for a "pragmatic, flexible approach" which focuses on "the proper balance between the coordinate branches." *Nixon v. Administrator of General Services, supra* at 442–443, 97 S.Ct. 2789–2790. The Court's approach rejects the argument that the Constitution contemplates a complete division of authority between the three branches and, instead, requires consideration of the extent to which a branch is prevented from accomplishing its constitutionally assigned functions. When the potential for disruption is present, the Court then requires a balancing of the interest involved. *Ibid.*

■ Determination of the precise boundaries of constitutional authority committed to the individual branches of the government presents a formidable task. The complexity of interests at stake in any conflict arising between the branches counsels caution and careful deliberation, for our constitutional system functions best in an atmosphere of institutional accord. However, when the assertion of authority by one branch interferes with the claim of institutional independence by another branch, it becomes the province and duty of the Judiciary to define the respective spheres of power. *United States v. Nixon, supra* at 704–705, 94 S.Ct. at 3105–3106. This task, neither simple nor always welcome, is nonetheless compelled by our constitutional scheme. As the Supreme Court, in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), stated:

> "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution."

369 U.S. at 211, 82 S.Ct. at 706. In the instant case, this Court is faced with the "delicate exercise" of determining if Congress, in enacting the Speedy Trial Act, has intruded upon the constitutional autonomy of the Judiciary.

■ The doctrine of separation of powers clearly contemplates a zone of judicial power which must be free from interference by

either the Legislative or Executive Branches. The Federalist No. 47 (J. Madison). Article III of the Constitution vests the judicial power of the United States in the Supreme Court and the lower federal courts. Unlike the powers conferred to the Legislative and Executive Branches under Articles I and II, Article III does not delve into any specific enumeration or description of what constitutes the elements of the constitutional power. However, the judicial power, like the executive and legislative powers, possesses constitutional boundaries which can neither be exceeded by the possessor of the power nor intruded upon by one of the other branches. For instance, it is clear that Congress has the power to regulate the executions of federal court judgments, *Wayman v. Southard*, 10 Wheat. (23 U.S.) 1, 6 L.Ed. 253 (1825), but it is equally evident that Congress cannot compel Article III courts to render advisory opinions. *Hayburn's Case*, 2 Dall. (2 U.S.) 409, 1 L.Ed. 436 (1792).

■■■ Assuming *arguendo* that Congress has the power to abolish the lower federal courts entirely through a complete withdrawal of jurisdiction, *see*, Hart, "The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic," 66 Harv.L.Rev. 1362 (1953), having established such courts, Congress cannot unduly interfere with purely judicial functions. *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871); *Michaelson v. United States*, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162 (1924); *see also*, Notes, "Separation of Powers and the Federal Rules of Evidence," 26 Hastings L.Rev. 1059, 1065–66 (1975). In *Klein*, the Supreme Court held unconstitutional an obvious attempt by Congress to influence, through its power over jurisdiction, the substantive outcome of cases pending before the courts. Chief Justice Chase's majority opinion concluded that Congress had "passed the limit which separates the legislative from the judicial power." 80 U.S. at 146–147. The *Klein* decision has been discussed extensively in terms of its implications for the constitutional independence of the Judiciary. *See, e. g.*, P. Bator, D. Shapiro, P. Mishkin & H.

Wechsler, *Hart and Wechsler's The Federal Courts and the Federal System* 315 (2d ed. 1973); G. Gunther, *Cases and Materials on Constitutional Law* 55 (9th ed. 1975); L. Tribe, *American Constitutional Law* 39 (1978). At the very least, *Klein* stands for the proposition that the Legislative Branch of our government cannot constitutionally mandate substantive results in cases pending before the courts. It also represents a basic theme of our constitutional scheme of government that the institutional independence of the Judiciary cannot be compromised by the actions of the other branches.

■■■ The institutional independence of the Judiciary must obviously include the ability to adjudicate individual cases in an atmosphere that is without interference from the other branches of government. *Klein, supra*. This adjudicative or decisional freedom also necessarily embraces a certain degree of independence in the execution of those decisionmaking duties. When Congress has called a court of the United States into existence and vested it with jurisdiction over certain subjects, the court at once becomes possessed of judicial powers commensurate to the jurisdiction conferred. *Michaelson v. United States*, 266 U.S. 42, 65–66, 45 S.Ct. 18, 19–20, 69 L.Ed. 162 (1924). In *Michaelson*, the Supreme Court recognized the authority of Congress to regulate within limits the criminal contempt power of the lower federal courts. However, the Court expressly stated that "the attributes which inhere in that power and are inseparable from it can neither be abrogated nor rendered practically inoperative." 266 U.S. at 66, 45 S.Ct. at 20.

The vital importance of administrative autonomy to maintaining our constitutional separation of powers has been recognized since the beginning of our constitutional history. In Federalist No. 48, Madison wrote:

"It is agreed on all sides that the powers properly belonging to one of the departments, ought not to be directly and completely administered by either of the other departments. It is equally evident,

that neither of them ought to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers."

The significance of administrative autonomy to the maintenance of institutional independence is particularly acute in the case of the Judiciary, which commands far fewer tangible resources than either of the other branches. The Federalist No. 78 (A. Hamilton). The import of avoiding legislative control over the administration of the judicial function was noted by commentators Levin and Amsterdam:

> "There are spheres of activity so fundamental and so necessary to a court, so inherent in its very nature as a court, that to divest it of its absolute command within these spheres is to make meaningless the very phrase *judicial power.*" [emphasis in original].

"Legislative Control Over Judicial Rule Making: A Problem in Constitutional Revision," 107 U.Pa.L.Rev. 1, 30 (1958). These writers expand their description of these exclusively judicial concerns by suggesting that

> "... there is a third realm of judicial activity, neither substantive nor adjective law, a realm of proceedings which are so vital to the efficient functioning of a court as to be beyond legislative power. This is the area of minimum functional integrity of the courts, what is essential to the existence, dignity and functions of the court as a constitutional tribunal and from the very fact that it is a court. Any statute which moves so far into this realm of judicial affairs as to dictate to a judge how he shall judge or how he shall comport himself in judging or which seeks to surround the act of judging with hampering conditions clearly offends the constitutional scheme of the separation of powers and will be held invalid." [footnotes omitted].

107 U.Pa.L.Rev. at 31–32. One "hampering condition" imposed on the judiciary by legislation which "clearly offends the constitutional scheme of the separation of powers" is a time limit within which the Judiciary must act on matters *sub curia.* 107 U.Pa.L. Rev. at n.148, n.155.

Levin and Amsterdam directed their attention primarily to state legislatures and state courts, but their discussion generally concerns an application of the doctrine of separation of powers which is consistent with the federal constitutional structure. Indeed, the historical experiences of the state systems can be instructive on the federal level in that the states have historically encountered more instances of actual attempts by the Legislature to intrude upon the Judiciary. However, the institutional independence of the Judicial Branches has been preserved as the doctrine of separation of powers has consistently caused the courts to declare void legislation which insisted on judicial action within a set period of time.

> "No one will deny that the legislative arm of the government has the power to alter and regulate the procedure in both law and equity matters, but for it to attempt to compel the courts to give a hearing to a particular litigant at a particular time, to the absolute exclusion of others who may have an equal claim upon its attention, strikes a blow at the very foundation of constitutional government. The right to control its order of business and to so conduct the same that the rights of all litigants may properly be safeguarded has always been recognized as inherent in courts, and to strip them of that authority would necessarily render them so impotent and useless as to leave little excuse for their existence and place in the hands of the legislative branch of the state, power and control never contemplated by the Constitution."

*Atchison, Topeka and Santa Fe Ry. Co. v. Long,* 122 Okl. 86, 251 P. 486, 489 (1926); *accord, Resolute Ins. Co. v. 7th Judicial District Court of Oklahoma,* 336 F.Supp. 497, 503 (D.Okl.1971), *aff'd,* 404 U.S. 997, 92 S.Ct. 558, 30 L.Ed.2d 550 (1971); *Lindauer v. Allen,* 85 Nev. 430, 456 P.2d 851, 854 (1969); *Sands v. Albert Pike Motor Hotel,* 245 Ark. 755, 434 S.W.2d 288, 291–292 (1968); *Waite v. Burgess,* 69 Nev. 230, 245 P.2d 994, 996 (1952); *Kostas v. Johnson,* 224

Ind. 540, 69 N.E.2d 592, 596 (1946); *Riglander v. Star Const. Co.*, 98 App.Div. 101, 90 N.Y.S. 772, 774–775, aff'd, 181 N.Y. 531, 73 N.E. 1131 (1905). For the same reasons legislative restrictions on the time within which courts must act in criminal cases as well as in civil cases have been declared unconstitutional, *see, e. g., Schario v. State,* 105 Ohio St. 535, 138 N.E. 63 (1922). The only recourse for a court faced with a legislative command endangering its "minimum functional integrity" is to give no effect to the command.

> "Because of the basic functions and inherent powers of the three co-equal Branches of Government, the co-equal independent judiciary must possess rights and duties, including the right and power to protect itself against any impairment thereof .... [T]he judiciary must exercise its inherent power to preserve the efficient and expeditious administration of justice and protect it from being impaired or destroyed."

*Carroll v. Tate,* 442 Pa. 45, 274 A.2d 193, 197 (1971).

The Court of Appeals of Maryland has recently found it necessary to rely upon the constitutional doctrine of separation of powers to invalidate legislation which intruded upon the judicial sphere of powers. In *Attorney General of Maryland v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981), the Court addressed the foundation of the inherent power of the Judiciary within a tripartite government:

> "In order to accomplish the purposes for which they are created, courts must also possess powers. From time immemorial, certain powers have been conceded to courts, because they are courts. Such powers have been conceded, because without them they could neither maintain their dignity, transact their business, nor accomplish the purposes of their existence. * * * 'The inherent power of the court is the power to protect itself; the power to administer justice ...; the power to promulgate rules for its practice; and the power to provide process where none exists. It is true that the judicial power of this court was created

by the Constitution, but, upon coming into being under the Constitution, this court came into being with inherent powers.'" [*State v. Cannon,* 196 Wis. 534, 221 N.W. 603, 603–04 (1928) quoting *In re Bruen,* 102 Wash. 472, 172 P. 1152 (1918).]

426 A.2d at 934. Although the Maryland case, and the cases cited therein, involved the inherent power of the Judiciary to regulate the practice of law, the doctrine of separation of powers contemplates a zone of judicial autonomy which extends to other areas as well. In *In Re Courtroom and Officers of Fifth Branch Circuit,* 148 Wis. 109, 134 N.W. 490 (Ann.Cas.1913B, 98), the Court upheld an injunction enjoining county supervisors from providing a court of general jurisdiction with inadequate and unsuitable quarters. Addressing the scope of the inherent power of the Judiciary, the Court stated:

> "The authorities, in so far as any can be found on the subject, are to the effect that a constitutional court of general jurisdiction has inherent power to protect itself against any action which would unreasonably curtail its powers or materially impair its efficiency."

148 Wis. at 121, 134 N.W. at 495.

The state courts have not been alone in recognizing the constitutional significance of judicial control of administration in the execution of the judicial function. Although not directly faced with a constitutional separation of powers issue, the late Justice Cardozo fully realized that the power to control the court docket was an integral facet of judicial power:

> "... the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes of its docket with economy of time and effort for itself, for counsel, and for litigants."

*Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 165, 81 L.Ed. 153 (1936); *see also, Avery v. Alabama,* 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377 (1939) (trial court given great latitude in disposition of requests for continuances, even

when denial of constitutional rights is asserted). Indeed, the power of the federal Judiciary to control its own proceedings is well established:

"[T]he power to direct trial judges in the execution of their decision-making duties was regarded as a judicial power, one to be entrusted only to a judicial body."

*Chandler v. Judicial Council*, 398 U.S. 74, 103, 90 S.Ct. 1648, 1663, 26 L.Ed.2d 100 (1970) (Harlan, J., concurring). Although the Court in *Chandler* did not reach the merits of the challenge to a statute vesting circuit councils with supervisory authority over individual judges, the opinion of the Court emphasized the importance of judicial independence in all aspects of the judicial function:

"There can, of course, be no disagreement among us as to the imperative need for total and absolute independence of judges in deciding cases or in any phase of the decisional function."

398 U.S. at 84, 90 S.Ct. at 1653.

In *United States v. Inman*, 483 F.2d 738 (4th Cir. 1973), *cert. denied*, 416 U.S. 988, 94 S.Ct. 2394, 40 L.Ed.2d 766 (1974), the Court was faced with an asserted conflict between the defendant's right to counsel and the court's right to control its own docket. Recognizing the importance of the Sixth Amendment right to effective assistance of counsel, the Court nonetheless upheld the trial court's denial of a motion for a continuance, stating:

"[T]he court also has the right to control its own docket to require that cases proceed in an orderly and timely fashion."

483 F.2d at 740. In *United States v. Correia*, 531 F.2d 1095 (1st Cir. 1976), the district court had dismissed an indictment because of the government's inability to proceed to trial at a continued date certain as a result of its inability to locate a key witness. In upholding the district court action, the Circuit Court used similar language in recognizing the principle that requires judicial control over judicial proceedings:

"It is axiomatic that the district court has inherent power to control its own docket to ensure that cases proceed before it in an orderly fashion."

531 F.2d at 1098.

The necessity of some degree of administrative autonomy for the Judiciary in the execution of its constitutional function does not render unconstitutional every Congressional action affecting the Judiciary. Undeniably, Congress possesses a constitutional role in the formulation and direction of rules for the orderly conduct of business in the federal courts. Two of the most notable examples of this role can be found in the Federal Rules of Civil Procedure and the Federal Rules of Evidence. *See, Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) and *Tot v. United States*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943). However, Congress' involvement in those areas of the judicial function clearly recognizes the significance of a certain degree of judicial autonomy. The Congressional rulemaking power is validly exercised in such a way as to avoid undue interference with the execution of the judicial power, thereby preserving the integrity of the doctrine of separation of powers.

■ The instances in which the Supreme Court has been faced with statutes infringing upon the independence of the Judiciary have fortunately been rare. The paucity of such controversies is testimony to the recognition by Congress that a strong and independent Judiciary is an instrumental and necessary component of our constitutional system. The principled development of constitutional doctrine has been premised upon the restraint of the individual branches in actions which could compromise the independence of the other branches or intrude upon their constitutional functions. For example, the Judiciary is prevented by the political question doctrine from deciding political questions which would infringe upon the other two branches. *See, e. g., Commonwealth of Massachusetts v. Laird*, 400 U.S. 886, 91 S.Ct. 128, 27 L.Ed.2d 130 (1970).

■ The doctrine of separation of powers includes checks and balances that allow each branch of government the opportunity

to bridle attempts by the other branches to exercise unharnessed powers. In addition, the very nature of our comprehensive system contemplates a certain degree of interdependence among the three co-equal branches:

"While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but independence, autonomy but reciprocity."

*United States v. Nixon, supra* 418 U.S. at 707, 94 S.Ct. at 3107 quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Thus, the Speedy Trial Act must be analyzed in the context of a constitutional balance of a "workable government." The role of the Judiciary under Article III must be weighed against the interests advanced by Congress in enacting the Speedy Trial Act in order to determine if Congress has "passed the limit which separates the legislative from the judicial power." *United States v. Klein, supra* at 146.

■ The Speedy Trial Act imposes on the federal district courts specific time limits within which criminal defendants must be processed and tried. 18 U.S.C. § 3161 *et seq.* If the obligatory time limits are not met, the Act provides for severe sanctions, including mandatory dismissal of indictments. 18 U.S.C. § 3162. The asserted purpose of the Act was to assist in reducing crime and the degree of recidivism by requiring speedy trials and by strengthening the supervision over persons released pending trial. H.R.Rep.No.93–1508, 93d Cong., 2d Sess. 1 (1974) [hereinafter cited as "House Report"], *reprinted* in [1974] U.S. Code Cong. & Ad.News 7401. The sponsors of the legislation were motivated by an assumption that the parties involved in the criminal process would not be successful in bringing about speedy trials, absent strong Congressional action. The principal sponsor of the bill, Senator Sam J. Ervin, Jr., summarized the concern as follows:

"Those of us in the Congress who have been working on this problem realize that speedy trial will never be a reality in the Federal courts until Congress makes clear to all that it will no longer tolerate delay. Unfortunately, while it is in the public interest to have speedy trials, the parties involved in the criminal process do not feel any pressure to go to trial. The court, defendant, his attorney, and the prosecutor may have different reasons not to push for trial, but they all have some reason. The overworked courts, prosecutors, and defense attorneys depend on delay in order to cope with their heavy caseloads. The end of one trial only means the start of another. To them, there is little incentive to move quickly in what they see as an unending series of cases. The defendant, of course, is in no hurry for trial, because he wishes to delay his day of reckoning as long as possible.

I believe, after years of studying this problem, that S.754 can begin to end this seemingly hopeless morass. The bill is based upon the premise that the courts, undermanned, starved for funds, and utilizing 18th century management techniques, simply cannot cope with burgeoning caseloads. The consequence is delay and plea bargaining. The solution is to create initiative within the system to utilize modern management techniques and to provide additional resources to the courts where careful planning so indicates."

120 Cong.Rec. 41618 (1974).

The assumption of the necessity for unilateral Congressional action in the judicial processing of criminal cases was by no means unanimous. The Judicial Conference of the United States and the Department of Justice opposed the enactment of the major features of Title I of the Act, particularly the mandatory and inflexible aspects of the bill. *House Report, supra* at 13, 17, 50–58, 78. In addition, numerous individuals involved in, and knowledgeable about, the criminal justice system opposed the approach taken by the legislation. *See, e. g.,* Testimony of Honorable John Feikens,

Judge, United States District Court for the Eastern District of Michigan, Hearings on S.754, H.R.7873, H.R.207, H.R.658, H.R.773 and H.R.4807 Before the Subcommittee on Crime of the Committee on the Judiciary, House of Representatives, 93rd Cong., 2d Sess., 241–243 (1974). But despite the reservations expressed by many, Congress enacted the legislation in a form which imposed rigorous procedural requirements and standards upon the Judiciary.

The constitutionally suspect nature of the Speedy Trial Act was judicially recognized in *United States v. Martinez*, 538 F.2d 921 (2d Cir. 1976). Justice Clark, sitting by designation on the Second Circuit, applied the doctrine of separation of powers to the Speedy Trial Act and found the constitutionality of the Act questionable. Affirming the lower court's refusal to release a defendant in custody awaiting trial for more than ninety days, Justice Clark stated for the panel:

"We find at least two grounds on which affirmance is required. The first is a constitutional one which we will not elaborate further than to note that there is a question under the doctrine of separation of powers that the Congress can exercise judicial authority to the extent indulged here."

538 F.2d at 923. In a footnote he added that "[s]ome of the language of the Act is so sweeping that it might well be construed as more than procedural, assuming Congress has the power to enact the latter." 538 F.2d at 923, n.4.

▇ The Speedy Trial Act infringes upon the constitutionally autonomous power of the Judiciary to a degree that cannot be squared with the doctrine of separation of powers. First, and most obviously, the Act attempts to determine the actual substantive outcome of individual criminal cases whose disposition has been committed to the judicial process. By requiring the dismissal of indictments in cases not brought to trial within a certain period of time, the Act produces a direct impact upon the ability of the courts to fulfill the judicial function of determining guilt or inno-

cence in criminal cases. Congress could arguably withdraw the entire criminal jurisdiction from the lower federal courts, or even abolish federal regulation of criminal activity. *See, Hart, supra.* However, once Congress has defined certain areas of federal criminal law and committed the adjudication of cases arising under such provisions to the jurisdiction of the federal courts, it cannot unduly interfere with the independence of the Judiciary in fulfilling its constitutional function. *United States v. Klein, supra.*

The impact of the Speedy Trial Act upon the execution of the judicial duties of Article III courts is not limited to criminal cases. The stringent controls on the handling of cases also dramatically affect the ability of courts to resolve disputes in civil cases. The procedural and durational restraints of the Speedy Trial Act severely hamper trial courts in their attempts to prepare civil cases for trial, find the time to try them, and assure that well-founded decisions are reached. In enacting the Speedy Trial Act, Congress advanced as one of its justifications, the inability of the courts to cope with burgeoning caseloads. *See, e. g.,* Statement of Senator Ervin, *quoted supra.* Yet by enacting a legislative proposal which concentrates on the progress of criminal cases, while ignoring the effects upon an increasing civil caseload, the Act merely serves to shift the focus of the problem to another area of the constitutional responsibilities of the courts.

The provisions of the Speedy Trial Act also transgress the constitutional separation of powers in that they constitute an unwarranted intrusion into the administration of the judicial system. Courts have occasionally acquiesced in legislative action over procedural rulemaking. *See, e. g., Hanna v. Plumer, supra,* and *Tot v. United States, supra.* However, the approach of Congress in enacting the Speedy Trial Act represented a fundamentally different approach than that of previous legislative actions affecting the Judiciary.

The Speedy Trial Act assumed as a basic premise that the Legislature is better suited

to regulating judicial procedure than the courts themselves. Congress failed to reach any consensus with the Judiciary over the provisions of the Act, but instead simply prescribed strict standards to be adhered to by the courts. One commentator who analyzed a number of pieces of legislation affecting the federal Judiciary concluded that the Speedy Trial Act represented a drastic departure from the previous pattern of Congress:

> "The Speedy Trial Act was in at least one sense a landmark law—never before had Congress involved itself so deeply in the internal administration and operation of the federal judiciary. Unfortunately, this approach resulted in a legislative process that was uncharacteristically adversarial, a statute that was uncharacteristically specific, and an implementation process controlled by forces other than the established internal patterns of decision making within the federal court system."

C. Kerwin, "Judicial Implementation of Public Policy: The Courts and Legislation for the Judiciary," 16 Harv.J. on Legis. 415, 440 (1979).

This unique and extensive involvement by Congress in the internal administration and operation of the federal Judiciary has significant implications for the constitutional scheme of separation of powers. The constitutional power to decide cases fairly and in accordance with the law can be exercised effectively only if the institutional autonomy of the Judiciary remains free from undue interference. The flexibility of the Judiciary to analyze the particular circumstances of each case is an important facet of the judicial power that should not, and under our Constitution cannot, be abrogated.

A major constitutional shortcoming of the Speedy Trial Act is that it diminishes the independence and flexibility of the Article III judicial power without adequately taking account of all the interests involved. The right of defendants and society, to assure that criminal trials are achieved as expeditiously as possible is only one area of concern affected by the far-reaching provisions of the Speedy Trial Act. Other societal interests are implicated as well by Congress' approach in this legislation. The ability of the criminal justice system to operate effectively and efficiently has been severely impeded by the Speedy Trial Act. Resources are misdirected, unnecessary severances required, cases proceed to trial inadequately prepared, and in some indeterminate number of cases, indictments against guilty persons dismissed. *See, e. g.*, Testimony of Philip B. Heymann, Assistant Attorney General, Department of Justice, Hearings on S.961 and S.1028 Before the Committee on the Judiciary, United States Senate, 96th Cong., 1st Sess., 31–56 (1979).

The deficiencies of the Speedy Trial Act are more than theoretical. The annual cost of the administration of the Act has been estimated to exceed $5,000,000, and its practical impact triggers the operation of the doctrine of the separation of powers. The burden which the time limits place on the federal district courts is heavy and the disruption severe. The limits of § 3161 and § 3164 may, in various contexts, be too short, and thus interfere with the quality of justice. A then member of the Department of Justice, in criticizing S.754 (a predecessor bill to the Speedy Trial Act), warned of the strain on the courts' ability to administer justice which the Act's time limits would cause:

> "Cases rushed to trial cannot be thoroughly investigated and prepared. Thus, unwarranted concessions, inadequate investigation and prosecution of cases, and increased congestion in the courts will cause a loss of public confidence in the effectiveness of the criminal justice system, more so than the present delays, which can more appropriately be eliminated through other avenues of reform. The complexity of S.754 will also create monumental administrative headaches. In multiple defendant cases, such as major narcotic conspiracies, judges may be forced to grant severances which would otherwise not be required. This in turn will lead to more trials and more congestion. In addition, as cases mature, last

minute reassignment of cases from judge to judge, prosecutor to prosecutor, and public defender to public defender will be necessitated to prevent dismissal—all of which will result in a lower quality of justice for the defendant and society." Statement of Joseph T. Sneed, formerly Deputy Attorney General, Department of Justice (now United States Circuit Judge, Ninth Circuit), Hearing on S.754 Before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, Senate, 93rd Cong., 1st Sess., 111–115 (1973). Nor was this an idle prediction of things to come attributable to judicial paranoia. This Court, on several occasions, has granted separate trials in lengthy conspiracy cases to accommodate the Speedy Trial requirements.

The Speedy Trial Act also implicates the societal interest in the ability of the federal courts to achieve their Article III judicial function in civil cases. The civil caseload of federal district courts has continued to climb during recent history. Filings since 1976 have risen 29.2 percent while the increase in pending civil cases has been even steeper, at 32.8 percent. Administrative Office of the United States Courts, "Sixth Report on the Implementation of Title I of the Speedy Trial Act of 1974," at 35 (September 30, 1980). Without the necessary flexibility, federal courts continue to be hampered in the administration of justice in this rapidly burgeoning civil caseload. *See, e. g.,* Testimony of Hon. Robert Peckham, United States District Judge, Southern District of New York, New York, New York, Hearings on S.961 and S.1028, Before the Committee on the Judiciary, United States Senate, 96th Cong., 1st Sess., 130 (1979). The adjudication of civil cases is an integral aspect of the Article III judicial function, with significant impact in such areas as habeas corpus and civil rights cases; civil antitrust suits; actions to collect taxes or recover those improperly paid; admiralty and patent cases that cannot be brought in state courts; suits to enforce or enjoin orders of government agencies where the health and well-being of thousands of citizens, their investments in businesses and employment are at stake; as well as many other cases in which Congress has seen fit to provide a federal forum. The Speedy Trial Act, with its myopic concern for rigid time limits in criminal cases, hinders the ability of the courts to focus sufficient resources on the adjudication of these important civil matters.

The sweeping approach taken by Congress in enacting the Speedy Trial Act is not supported by Supreme Court decisions interpreting the constitutional right to a speedy trial. Certain dicta in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) received prominence during the Congressional hearings preceding the passage of the Act. The sponsors of the Act bootstrapped the following language of the Supreme Court into a suggestion that the Congress should quantify by legislation the right to a speedy trial:

"The first suggestion is that we hold that the Constitution requires a criminal defendant to be offered a trial within a specified time period. The result of such a ruling would have the virtue of clarifying when the right is infringed and of simplifying courts' application of it . . . .

But such a result would require this Court to engage in legislative or rulemaking activity, rather than in the adjudicative process to which we should confine our efforts. We do not establish procedural rules for the States, except when mandated by the Constitution. We find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months. The States, of course, are free to prescribe a reasonable period consistent with constitutional standards, but our approach must be less precise."

407 U.S. at 523, 92 S.Ct. at 2188. *See, e. g., House Report, supra* at 7405; *see also,* Statement of Congressman Cohen, Hearings on S.754, H.R.7873, H.R.658, H.R.773, and H.R.4807 Before the Subcommittee on Crime of the Committee on the Judiciary, House of Representatives, 93rd Cong., 2d Sess. at 214, 358 (1974).

A clear reading of the language in *Barker v. Wingo*, however, fails to support the inference given to it in Congress. The Legislative Branch certainly possesses authority under our constitutional scheme to take action designed to protect the interests embodied by the Sixth Amendment right to a speedy trial. However, the approach taken by the Speedy Trial Act not only abridges the constitutional scheme of separation of powers but is inconsistent with the Supreme Court interpretations of the constitutional right to a speedy trial. The Supreme Court's refusal in *Barker v. Wingo* to specify a set number of days within which a defendant must be tried was not an invitation to Congress to attempt to do so, for the Court expressly stated that, "[w]e find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months." 407 U.S. at 523, 92 S.Ct. at 2188. The opinion did contain a general comment on the role of an adjudicating court, but it did not condone a legislative attempt to remove the flexibility of the courts in their adjudicative function. Instead, the Court clearly indicated the necessity for flexibility in dealing with the interests implicated by the right to a speedy trial:

> "[B]ecause of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case."

407 U.S. at 530–531, 92 S.Ct. at 2191–2192. [footnote omitted].

Congress was not without alternatives to dealing with the speedy trial problems in a manner that would have been less intrusive upon the constitutional autonomy of the Judiciary and more consistent with Supreme Court interpretations of the constitutional right to a speedy trial. The provisions of Rules 48(b) and 50(b) of the Federal Rules of Criminal Procedure represented an approach to speedy trial concerns that was more in keeping with previous Congressional involvement with judicial procedures. Under Rule 50(b) the courts were given discretion to deal with their own backlogs as each district court was required to submit to the Judicial Conference a formal plan for the prompt disposition of criminal cases. However, rigid and absolute time limits were not imposed and the courts were free to make decisions under the guidance of the flexible standard enunciated in *Barker v. Wingo*, without any diminishment of the Judiciary's institutional independence. The approach of Rule 50(b) was not the only alternative available to Congress. If uniform federal guidelines for the disposition of federal criminal cases were considered desirable, Congress could have adopted presumptive rules establishing fixed time periods but allowing flexibility for the consideration of all the factors involved in a particular case. Such an approach would have avoided unnecessary intrusion in the judicial process and would have been more in accord with Supreme Court interpretations of the constitutional right to a speedy trial.

The circumstances of the instant case provide an illustration of some of the shortcomings of the Speedy Trial Act, on both a constitutional and a practical level. The defendant was originally indicted in July of 1980. He remained at large as a fugitive while his co-defendants either pleaded guilty or went to trial. He was finally arrested on the West Coast on January 19, 1981, and returned to this District. His first appearance before a judicial officer of this Court took place on January 30, 1981, when he appeared before a Magistrate who set bail in the amount of twenty-five thousand dollars. Because the defendant's trial could not be commenced within seventy days of that date, the dictates of the Speedy Trial Act would require dismissal of the indictment. 18 U.S.C. §§ 3161(c)(1) and 3162(a)(2).

If the terms of the Speedy Trial Act were to be given effect in this case, the Court would have been faced with the choice of conforming its docket calendar to the requirements of the Act or dismissing the indictment against this defendant. The latter alternative would obviously compromise the ability of the Court to fulfill the

judicial function of determining, or presiding over a jury's determination of, guilt or innocence of the defendant. The rigid terms of the Speedy Trial Act would mandate dismissal of the indictment as the result of a ten-day delay in the commencement of the trial, even though the initial appearance and arraignment had already been delayed at least six months while the defendant remained at large as a fugitive and without any suggestion or claim of a denial of the constitutional right to a speedy trial under the Sixth Amendment. On the other hand, adhering to the time requirements of the Act would have been virtually impossible. A complex civil antitrust case had long been scheduled for a jury trial during the time period prior to April 20, 1981. To require the Court to revamp the schedules of all those involved in such an important civil matter, for the momentary convenience of one former fugitive, would represent the height of judicial inefficiency and inequity. These circumstances are in no way extraordinary and demonstrate the wisdom of our Constitution in prohibiting one co-equal branch from interfering with the administration of another's duties.

The Court is cognizant of the defendant's right to a speedy trial, just as it is cognizant of all his rights under the Constitution, and it is satisfied that the even-handed scrutiny of the appellate courts will not only preserve those rights but will do it without legislative interference. The dictates of *Barker v. Wingo, supra,* and Rules 48(b) and 50(b) of the Federal Rules of Criminal Procedure adequately protect a defendant's right to a speedy trial, which must by its very being remain a "relative concept." Under these principles there is no valid reason requiring that this indictment should be dismissed.

Accordingly, it is this 4th day of June, 1981, by the United States District Court for the District of Maryland, ORDERED:

1. That the motion of defendant Brainer to dismiss the indictment for lack of a speedy trial be, and the same is, hereby DENIED; and,

2. That a copy of this Memorandum Opinion and Order be sent to the attorney for the defendant and to the United States Attorney for the District of Maryland.